Jerry E. STEWART and Richard Eugene Smith et al., on behalf of themselves and all others similarly situated, Plaintiffs,

v.

Brad GATES et al., Defendants.

No. CV 75–3075–WPG.

United States District Court, C. D. California.

May 3, 1978.

584

Terry Smerling, Fred Okrand, Jill Jakes, Mark D. Rosenbaum, ACLU Foundation of Southern California, Los Angeles, Cal., for plaintiffs.

Adrian Kuyper, County Counsel, Arthur C. Wahlstedt, Jr., Asst. County Counsel, Santa Ana, Cal., for defendants.

## MEMORANDUM OF DECISION

WILLIAM P. GRAY, District Judge.

This class action, which raises constitutional challenges of practices and conditions of confinement of prisoners at the Orange County Central Jail in Santa Ana, California, has been tried, argued, briefed and submitted to this court for decision.

In my Memorandum to Counsel of January 26, 1978, I disposed of some of the issues of fact listed in the pretrial order, beginning at page 14. I shall undertake here to state my findings and conclusions with respect to the remaining issues.

■ In reaching such findings and conclusions, and in rendering judgment thereon, I have tried to be mindful of two well established principles. On the one hand, this court has the obligation to protect the constitutional rights of prisoners to due process and equal protection of the laws, and to be free from cruel and unusual punishment. On the other hand, courts must be careful to refrain from imposing upon jail administrators their personal views as to how penal institutions should be operated and the conditions under which inmates should live.

It is not difficult to recognize and enter orders against extremely bad living conditions or harsh and cruel discipline as being in violation of constitutional rights. But the question of whether less onerous treatment that may be undesirable, or even deplorable, is bad enough to be termed a constitutional deprivation presents some very difficult problems. In undertaking to resolve these matters, this court has tried to limit its interference to situations in which a constitutional right is quite clearly involved. As to these matters, the court intends to make certain that the remedial actions that it directs are accomplished. However, there are a number of situations in which corrective measures appear desirable but the court refrains from issuing orders, in the belief that the problem involved does not reach constitutional proportions. Some of these instances are "borderline," and in withholding its hand the court takes considerable comfort in the conviction that the defendant Sheriff and his staff are genuinely desirous of administering the County Jail in such manner as to give all reasonable consideration to the comfort and sensibilities of the inmates. In accordance with such belief, this memorandum contains certain recommendations that counsel for the defendants are requested to transmit to his clients for their consideration.

The following paragraphs are numbered according to the similarly numbered issues of fact in the pretrial order to which they pertain.

■ 5. The defendants do read, on a selective basis, prisoners' outgoing and incoming mail. This is done, not for the broad purpose of censorship, but in furtherance of "the substantial governmental interests of security, order, and rehabilitation", as these terms are used in *Procunier v. Martinez*, 416 U.S. 396, 413, 94 S.Ct. 1800, 1811, 40 L.Ed.2d 224 (1974). In light of that decision, this court cannot enjoin such process of examination. However, this court invites the attention of the defendants to the admonition in the opinion in *Martinez* that ". . . the limitation of First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved." (416 U.S. at 413, 94 S.Ct. at 1811). The opinion also suggested that ". . . the weight of professional opinion seems to be that inmate freedom to correspond with outsiders advances rather than retards the goal of rehabilitation . . . ." (416 U.S. at 412, 94 S.Ct. at 1811).

Under these circumstances, the court commends to the defendants that they give consideration to the likelihood, or at least the possibility, that, except in unusual circumstances, outgoing mail need not be examined at all and that incoming mail should be checked only for contraband.

■ 6. and 7. It is well established that public interest does require that some people accused of crime be held in custody pending trial. But pretrial prisoners have a right that no more restraints shall be placed upon their liberty than such custody reasonably entails. This clearly means that they must be allowed to communicate by telephone with members of their families, or with anyone else they choose, at all reasonable times. As the defendants suggest, there is always the possibility that plans concerning escape or importation of contraband may be hatched or developed through telephone conversations, and there is the ever present risk that fraudulently placed long distance calls may result in expense to Orange County. The existence of these dangers, which may be reduced by reasona-

ble monitoring and supervision, cannot justify preventing or unduly limiting prisoners in their use of the telephone.

Telephone facilities available to inmates, as of January 26, 1978, are entirely inadequate and much too inaccessible. Not less than sixteen additional telephones should be installed in locations that the defendants shall determine to be most reasonably accessible. These telephones, and all other telephones installed for inmates' use, should be made available to the inmates for outgoing calls at reasonable times upon request, subject to priorities of emergency and rotation.

■ 8. Visits to prisoners take place daily over periods of at least six hours, each inmate being allowed one visit of thirty minutes, five days per week. Minor children must be accompanied by adults, and former inmates may not be visitors within sixty days following their release from the jail. The defendants relate the latter restriction to the requirements of institutional security, and in this they must be upheld. In *Pell v. Procunier*, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974), the Court was confronted with a challenge to a similar regulation. The opinion stated:

"In this case the restriction takes the form of limiting visitations to individuals who have either a personal or professional relationship to the inmate—family, friends of prior acquaintance, legal counsel, and clergy. In the judgment of the state corrections officials, this visitation policy will permit inmates to have personal contact with those persons who will aid in their rehabilitation, while keeping visitations at a manageable level that will not compromise institutional security. Such considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters. Courts cannot, of course, abdicate their constitutional responsibility to delineate

and protect fundamental liberties. But when the issue involves a regulation limiting one of several means of communication by an inmate, the institutional objectives furthered by that regulation and the measure of judicial deference owed to corrections officials in their attempt to serve those interests are relevant in gauging the validity of the regulation." (417 U.S. at 827, 94 S.Ct. 2800 at 2806).

■ It is understandable that the defendants are reluctant to receive unaccompanied minors as visitors at the jail. On the other hand, a prisoner may have teenage children that are fully capable of coming alone and who otherwise would be unable to visit their parent. Accordingly, inmates should be permitted, upon prior request, to receive unaccompanied visits from their minor children.

■ 10. The defendants now allow visitors to bring books, magazines and newspapers that are delivered to inmates after inspection. However, prisoners are not permitted to receive such material through the mail, other than from publishers or other dealers whose identities can be recognized from the packages. The court is aware that to allow prisoners to receive any packages through the mail creates substantial and somewhat expensive problems of inspection, in order to minimize the risks that explosives or other contraband may be involved. However, the court believes that the right of a prisoner to receive reading material of his own selection is so strong that it outweighs the resulting burden upon the defendants. The family or friends of some inmates may live so far from the jail that it is not feasible for them to hand carry books or magazines from their personal libraries. The mail should be available for such delivery, subject to reasonable inspection.

■ 12. The defendants have presented schedules to support their contention that the general inmate population at the men's jail is allowed two hours and twenty minutes of outdoor roof recreation per week. The court is inclined to accept the defend-

ants' assurance in this respect and finds that, under all of the circumstances, such an amount of time for exercise is barely sufficient. Accordingly, no order on this subject will be rendered.

However, based upon the testimony of several inmates, it appears likely that in some instances the actual stay on the roof is less than two hours and twenty minutes per week, due to occasional shaving of schedules and underestimation of the time spent in transit between cell and roof. It is recommended to the Sheriff that he monitor the exercise program in order to make certain that the full two hours and twenty minutes per week are allowed, and to see if this minimal time cannot be expanded.

14. The six-man cells and the four-man cells provide only about 21.5 square feet of living space per occupant. This area is far less than the 40 square feet prescribed as a minimum by the California Minimum Jail Standards, 15 Cal.Adm. Code 1081(d), and several published judicial opinions have considered comparable, or even larger, space to be inadequate. *See*, for example, *Detainees of Brooklyn House of Detention for Men v. Malcolm*, 520 F.2d 392, 398 (2d Cir. 1975) (20 square feet); *Moore v. Janing*, 427 F.Supp. 567, 572 (D.Neb.1976) (20 square feet); *Pugh v. Locke*, 406 F.Supp. 318, 332 (M.D. Ala.1976) (40 square feet for single occupancy); *Inmates of Suffolk County Jail v. Eisenstadt*, 360 F.Supp. 676, 679 (D.Mass. 1973) (44 square feet). In *Gates v. Collier*, 390 F.Supp. 482, 486 (N.D.Miss.1975), aff'd 525 F.2d 965 (5th Cir. 1976), Chief Judge Keady stated that "We know from the undisputed evidence that generally accepted correctional standards require a minimum of 50 square feet of living area for every prison inmate."

However, a reading of these and many other authorities convinces me that there is no specific number of square feet that must be accorded an inmate as his cell space, in order to square with constitutional requirements. Some of the opinions that asserted minimum space requirements were concerned with antiquated structures that were unsatisfactory in many respects; in other cases, the inmates were confined to their cells virtually all of the day and night. Here, the jail is of modern construction, the cell areas are reasonably well lighted and ventilated, and the inmates have several daily breaks in the time spent in their cells. The question here concerned is whether or not the area in which an inmate spends his time is reasonably habitable, as opposed to being cramped and dingy. In order better to assess this situation, and with the prior knowledge of counsel, I returned recently to the jail to have another look at the cells. The four and six-man cells are not what one could call "roomy". However, they do not give the impression of being oppressively crowded. One or more of the assigned inmates were away from virtually all of the respective cells at the time that I was there. Some were in the nearby day room; others were reported to be in court, or with a visitor, or on sick call, or absent for some other reason. Except at night when the men are on their beds, it appears that the cells seldom are fully occupied, and to take this into account adds considerably to the floor space accorded each man. Also, the fact that an inmate may be out of his cell for meals, for occasional rooftop exercise, and for frequent and sustained periods in the day room, lessens substantially the impact of the smallness of his proportionate space in the cell itself.

In order to accord each man the 40 or 50 square feet of cell space that are authoritatively regarded as desirable minimums, the County of Orange would be obliged to make drastic and very expensive changes in their means and manner of housing prisoners. Although willing to require such change if necessary to preserve constitutional rights, this court concludes that reasonable regard for the comfort of the inmates does not require that such extreme measures be taken at the present time. The court expects that future modifications of the jail structure or changes in the system of allocating prisoners among the penal facilities of Orange County will take into appropriate account the increasingly enlightened standards with respect to the liv-

ing space that should be accorded each inmate.

■ In the course of the above-mentioned supplemental visit to the jail, I noticed several instances in which an inmate was sleeping on his assigned mattress that had been placed directly on the concrete floor of a cell, immediately adjacent to the toilet, because all of the bunks were allotted to other prisoners. If the public, through its judicial and penal system, finds it necessary to incarcerate a person, basic concepts of decency, as well as reasonable respect for constitutional rights, require that he be provided a bed. An order to such effect will be included in the judgment filed contemporaneously with this memorandum.

■ 16. Based upon the testimony at the trial, the court concludes that the inmates are given an inadequate time within which to eat their meals in the dining hall. The court is sympathetic with the security concerns of the jail administrators when large numbers of inmates are congregated in a limited space in the presence of a relatively few unarmed deputies, which is what occurs during the serving of meals, and I agree that such instances should not be prolonged more than necessary. However, mealtime is an important occasion to a prisoner, and he should be entitled to savor his food, along with a bit of conversation, rather than be obliged to eat in a hurried atmosphere. An inmate should be allowed not less than fifteen minutes at the meal table, and an order will be issued accordingly.

■ 17. On court days, all prisoners are awakened at 3:30 a.m. in order that the jail authorities may accomplish the processing necessary to deliver court bound prisoners to courthouses in various parts of the County by 8:30 a.m. Upon returning from court, some prisoners do not get back into their cells until about 8:00 p.m. All inmates must be on their feet for the evening count at 8:30 p.m.

Even after reading the defendant's post-trial explanation, I am completely unable to understand why it is necessary to awaken at such an early hour the prisoners that are scheduled for court, and I am even more at a loss to understand why it is necessary to get everyone up at 3:30 a.m. in order to put about twenty-five percent of the jail population on the buses according to schedule.

The defendants suggest that the inmates may sleep uninterruptedly between 8:30 p.m. and 3:30 a.m. and that those not going to court have ample opportunity for "sack time" during the day. However, the differences in the noise and lighting levels and in "TV fare" in the daytime, as compared to the night, hardly make the former a relatively satisfactory time for sleep, not to speak of the undesirability of having to change the bedtime habits that most of us have developed over the years.

If carefully considered jail administration requires adherence to such extreme and almost bizarre scheduling, the obligation to get inmates to court on time must take priority over concern for the comfort of the prisoners in this respect. The defendants will be expected, within the next sixty days, to reexamine their procedures with a view to establishing a later wake-up hour for court-bound inmates and/or allowing the remaining inmates to sleep through such wake-up hour. If, after such careful review, the defendants conclude that they cannot do better than they now are doing in this respect, they will be obliged to give a much better justification for such conclusion than the court has received thus far.

In the meantime, and except under unusual circumstances, each inmate should be accorded the opportunity for eight hours uninterrupted sleep during the night before he goes to court and during the night following his return from court.

■ The holding cells into which the court-bound inmates are distributed before boarding the buses in the morning and following their return in the afternoon or evening are about twelve feet by fifteen feet. Each of them contains a bench or benches that can accommodate perhaps as many as twelve men. However, often as many as twenty-five or more men are confined in

one of these cells and are kept there upwards of two hours. At the time of my supplemental visit to the jail, there were twenty-three men in one of those cells. The benches were fully occupied and some of the men were seated on the concrete floor while others were standing. It is doubtful if all of the latter could have found sitting space on the floor if they had tried. The place reminded me quite specifically of a pen for domestic animals. Prisoners awaiting processing of any kind should be given a place to sit in a manner consistent with human dignity, and an order will be made accordingly.

18. Jail authorities quite properly conduct "shakedown" inspections of the cells in search of contraband and other items not permitted to be retained, such as food, excessive correspondence, etc. The defendants presented evidence tending to show that these shakedowns are conducted discreetly and without disruption of the inmates' property; the inmates' testimony likened the process to a whirlwind. Frequently, items are removed as trash or are stored when a reasonable explanation or a request might result in their being allowed to remain. The shakedown process is a major source of grievances on the part of the inmates, and the court believes that these problems would be reduced substantially if the inmates could observe the inspections of their respective cells. This could be accomplished while the inmates remained outside the cells but near enough to see what was occurring and raise or answer any relevant inquiry.

The court will recommend to the defendants that their limits on personal belongings that may be retained in the cells be relaxed somewhat, particularly with respect to correspondence and photographs.

20. The evidence indicated that in some instances new arrivals at the jail were able to obtain items of personal hygiene and other needed sundries only after several days' delay. It does not appear that these occasions are particularly frequent, but it is recommended that the defendants monitor this process to see if improvement is indicated.

48. The plaintiffs complain that the jail law library is inadequate and that pro pers are not given direct access to the books on the shelves. Instead, they are obliged to submit their requests for books, not more than five at a time, to a "runner", who will undertake to obtain them, either from the jail law library or from the Orange County Law Library, located proximate to the jail. The pro pers make use of the books in their cells or in the adjacent day rooms. The runner will return books to the jail library and, upon request, will obtain additional books for an inmate several times per day; County Law Library service may be as infrequent as overnight.

As the plaintiffs point out, the law library at the Orange County Jail is less complete than that of the Los Angeles County Central Jail, although several sets of books have been added since the time of trial. But it seems to me that the reasonably prompt availability of books from the well-equipped Orange County Law Library fulfills the constitutional right of the prisoners to access to law books.

The above-described arrangement is hardly compatible with extensive research, but if an inmate has a complex legal problem that requires reference to many books in a limited time, it is likely that his interests would best be served by seeking the help of an attorney. In this respect, the Public Defender or retained counsel can be made available to him.

59. The defendants impose "administrative segregation" upon certain inmates that are believed to be so assaultive or disruptive as to make it necessary or appropriate to keep them away from other inmates, and, in some instances, from each other. Accordingly, these inmates are denied the use of the day room and of the chapel, have no rooftop exercise, are not allowed visitors, and are fed in their cells. In contrast to prisoners in "disciplinary isolation", who are confined to cells for as much as ten days for offenses against jail regulations, the treatment accorded inmates in administrative segregation is not based upon offenses com-

mitted within the jail, but strictly upon an assessment of their propensities. This seems to present a vicious circle; a prisoner whose current conduct does not require punishment but is nonetheless "segregated" constantly in his cell is likely, for that very reason, to develop the assaultive or disruptive tendencies that were attributed to him.

▓▓▓▓ The administrators of the jail have the right and the obligation to take unusual steps to maintain control over inmates that they regard as being potentially assaultive or disruptive. But these inmates, like the others, have a constitutional right not to be subjected to cruel and unusual punishment, and to deprive them arbitrarily of visitation, roof exercise, and visits to the day room and the chapel infringes such constitutional right. An order will be entered requiring the modification of these restrictions.

It is recognized that the carrying out of such an order will doubtless add to the burdens of the Sheriff's deputies and require adjustments in scheduling, to the extent that the prisoners in administrative segregation must be kept separate from other inmates. But so long as such a prisoner does not abuse these rights, making them available to him is one of the inherent responsibilities of jail administration.

## JUDGMENT

In this action, the plaintiffs, on behalf of inmates of the Orange County Jail, challenge certain policies and practices of the defendant administrators of the jail and the living conditions under which the inmates are maintained. The matter has been tried and briefed, and the court has made findings of fact and conclusions of law in form of Memoranda to Counsel issued on January 26, 1978, and on the date hereof. In accordance with such findings, the court renders this judgment.

IT IS ORDERED AS FOLLOWS:

1. The defendant jail authorities shall cause to be installed not fewer than sixteen pay telephones (in addition to those in operation on January 26, 1978) in locations that the defendants shall determine to be most reasonably accessible to the inmates. These telephones, and all other telephones installed for inmates' use, shall be made available to the inmates for outgoing calls at reasonable times upon request, subject to priorities of emergency and rotation.

2. The defendant jail authorities are directed to allow, upon prior request, visits to inmates by their minor children unaccompanied by adults.

3. Inmates will be permitted to receive through the mail any books, magazines or newspapers that may lawfully be transmitted through the United States postal system, subject to reasonable withholding for inspection for contraband and security purposes.

4. Every prisoner kept overnight in the jail will be accorded a mattress and a bed or bunk upon which to sleep.

5. The defendant jail authorities are ordered to allow inmates not less than fifteen minutes within which to complete each meal.

6. The defendant jail authorities are ordered to accord to each inmate the opportunity for eight hours uninterrupted sleep on the night before and the night after each court appearance.

7. The defendant jail authorities will provide a place, other than the floor, for each inmate to sit while being detained in a holding cell, or elsewhere, before leaving for court or following return from court.

8. The defendant jail authorities will permit an inmate to be sufficiently proximate to his cell when a "shakedown" inspection occurs that he may observe the process and respond to such questions or make such requests as circumstances may indicate.

9. Whenever inmates in their cells may properly be at ease on their beds, they will be permitted to cover themselves with blankets provided that sufficient anatomy is exposed to establish the presence of a person.

10. Inmates in administrative segregation will be permitted:

(a) To attend regularly scheduled religious services of their own selection once each week or, alternatively, to make individual visits to the chapel once each week for not more than twenty minutes.

(b) Daily use of a day room for not less than two hours.

(c) Rooftop exercise and recreation at least twice each week for a total time of not less than two hours per week.

(d) To receive visitors not less than twice each week. Such visits shall take place at the regular visitors' facility or at such other places as the defendants shall determine.

Nothing in this paragraph 10 shall interfere with the authority of the defendants to curtail or eliminate the rights herein accorded an inmate in administrative segregation in the event such inmate becomes violent or disruptive in the course of exercising such rights.

11. The defendant jail authorities will revise their published rules to give appropriate information with respect to the changes in practices that will be adopted pursuant to this judgment.

With respect to the remaining issues litigated in this case, it is adjudged that no constitutional violation has been established warranting court action.

The court retains jurisdiction to modify the foregoing orders upon good cause shown.