[Civ. No. 27464. Fourth Dist., Div. Two. July 12, 1983.]

INMATES OF THE RIVERSIDE COUNTY JAIL AT INDIO,
Plaintiffs and Respondents, v.
BEN CLARK, as Sheriff etc., Defendant and Appellant.

**COUNSEL**

Gerald J. Geerlings, County Counsel, W. W. Miller, Assistant County Counsel, and Timothy J. Davis, Deputy County Counsel, for Defendant and Appellant.

Gary Scherotter for Plaintiffs and Respondents.

**OPINION**

**MORRIS, P. J.**—The sheriff of Riverside County has appealed from an order of the superior court granting a petition for a writ of habeas corpus filed on behalf of 31 inmates of the Riverside County jail. The petition alleged that the petitioners' detention was illegal in that the conditions of confinement violated state and federal constitutional standards.

Supporting declarations attached to the petition included complaints that overcrowding made it necessary for inmates to sleep on mattresses on the floors of the dayrooms and in the shower areas, that clean clothing and linen were difficult if not impossible to obtain for many inmates, that plumbing

and fixtures were in a severe state of disrepair, that garbage built up on the floor of dayrooms, that fungus and mildew persisted in the shower areas, that the air conditioning units had broken down for extended periods, that there were insect infestations, and that requests for medical attention went unanswered. Only one inmate, a weekend prisoner, reported violence. His graphic account ended with the notation that he feared retaliation from other inmates for reporting incidents of violence, and that he intended to flee the state rather than return to serve the balance of his sentence.

Following extensive hearings, the superior court concluded the facility was overcrowded, understaffed, and operated under conditions proscribed by administrative regulation, statute, and the California Constitution. The court issued a comprehensive remedial order. The Sheriff of Riverside County appealed, and this court stayed portions of the trial court's order.

Appellant makes two basic arguments. First, he contends that the evidence does not show that any actionable violations of the inmates' rights have occurred. Second, even assuming the inmates' rights have been violated, appellant argues that the court abused its discretion in issuing certain portions of its remedial order.

## I. *The Evidence*

The evidence before the trial court included documentary evidence relating to jail practices, including maintenance, incident and population logs, testimony of jail personnel and expert witnesses, and the declarations of the inmates. The trial court visited the jails of San Bernardino, Orange, Los Angeles and San Diego counties, as well as the Indio facility. The evidence showed, inter alia, the following:

The Indio jail was built in 1959, and modified in 1969. According to the assistant executive officer of the State Board of Corrections, the facility is "very badly outmoded." It would be denied state funding as substandard if it were now proposed to be built. The jail has eight main housing units, or "tanks," a detoxification unit, and three single-inmate isolation cells.

A floor plan of the jail was received as an exhibit. Tanks 1 through 4 each consist of three 8-inmate cells and a dayroom. Each cell is 20 feet, 9 inches by 10 feet and contains eight bunks, a toilet and a sink. Each dayroom is 31 feet, 11 inches by 20 feet, 9 inches and each contains a shower, tables and benches for 24 inmates, 2 sinks, a toilet, and a television set. All meals are served in the dayrooms.

Tanks 5 through 8 are dormitory style tanks. Tanks 5, 6 and 7 house 14 inmates each, and Tank 8 houses 7 inmates. The total "rated capacity" of

the Indio jail, as established by the Board of Corrections, is 148 inmates, excepting those housed for less than 8 hours in the detoxification unit. The Board of Corrections considers a jail to be "overcrowded" when it exceeds 80 percent of its "rated capacity." Thus, the Indio facility would be overcrowded on any day in which its inmate population exceeded 118.

Indio jail inmates are classified for housing purposes. Tank 1 houses unsentenced male prisoners who are in protective custody, designated as low risk, or determined to be homosexual. Tank 2 contains both sentenced and unsentenced male prisoners, segregated by cell, who are referred to as "high power" and classed as security risks. Tanks 3 and 4 house unsentenced male prisoners. Tank 5 houses sentenced male prisoners who are not on a work program and do not qualify for transfer to other institutions. Tank 6 contains sentenced males who have been designated "trustees" and work in the facility. Tank 7 houses unsentenced "protective custody" males and Tank 8 holds unsentenced female inmates.

During the first six months of 1981, the most crowded months for Tanks 1, 3 and 4 were: Tank 1—February (132 percent of rated capacity); Tank 3—June (134 percent); and Tank 4—June (135 percent). Of the 144 days during that period for which daily population records were introduced into evidence, Tank 1 exceeded its rated capacity on 112 days, and was overcrowded for a total of 143 days. Tank 3 exceeded its rated capacity on 92 days, and was overcrowded on 125 days. Tank 4 exceeded its rated capacity on 93 days, and was overcrowded for 127 days. On the most crowded days, the population of each of these three 24-inmate tanks reached 46, 45 and 42 respectively.

Tank 5 was overcrowded on 116 of 142 days for which figures were made available, and on 78 days exceeded its rated capacity. The most crowded month was March (133 percent of capacity). The peak day was January 24, on which 26 men were housed in the 14-inmate tank. Tank 6 was overcrowded on each of 143 days for which figures were available, and exceeded its rated capacity on all but one of those days. The most crowded month was February (150 percent of capacity). Taken as a whole, the jail was overcrowded on 137 of 143 days in the first half of 1981, and exceeded its rated capacity on 65 days (approx. 44 percent). This figure excludes those in the detoxification unit, and assumes that juveniles not listed as placed in single cells were housed in the tanks. Opposite assumptions would produce significantly higher totals of overcrowding.

The jail population records are not complete, recording only 143 of 181 days during the first 6 months of 1981. No explanation was given for the missing days. Graphic analysis of the population records indicates that many

of the 38 missing days were days for which a high level of overcrowding was very likely to be experienced.

The jail is understaffed. The authorized staffing of the Indio jail at the time of hearings was: 1 sheriff's lieutenant; 3 sheriff's sergeants; 14 deputy sheriffs; 2 cooks; 1 food service worker; 1 clerk-typist; 5 sheriff's aides I; 4 sheriff's aides II; and 5 sheriff's service officers. As of September 1981, positions for one deputy sheriff, two sheriff's aides, one cook and one service officer were vacant.

For the 1981-1982 fiscal year, the sheriff requested funding for two additional sergeants, three deputy sheriffs, an institutional nurse, a sheriff's aide, a service officer, and a data terminal operator. A similar request had been made the year before. These positions were not funded, leaving 31 positions filled.

The evidence showed that the facility's plumbing was in frequent disrepair. The clothing and linen exchanges were irregular, but only occasionally resulted in an inmate's inability to obtain clean clothing and linen weekly. Unsentenced male inmates were allowed only two hours of recreational time each week, while sentenced male inmates were allowed three hours. The jail physician attended sick call at the jail five days per week at 11 a.m. No physician was available on weekends. There was no nurse. Medications which were prescribed for inmates were packaged for distribution by unlicensed personnel, and understaffing resulted in the inability of jail personnel to distribute medications in a timely fashion.

A log of incidents investigated by the jail authorities was introduced into evidence; 48 "incidents," ranging from "suicide attempt or other" (2 reports) through misdemeanor assault (16 reports) were logged for the first 6 months of 1981. The jail commander estimated that about 80 percent of all incidents were reported. Of the five jail facilities the court visited, the Indio facility was the only one in which visual supervision of inmates by deputies could not be accomplished from the deputies' regular stations. This disparity became a focus for the court's questioning of witnesses. The court found that supervision of the inmates and deterrence of assaultive behavior was best accomplished through personal visual inspection of the housing units, yet the practice of leaving the solid metal security doors which separated each housing unit from the central corridor closed impeded effective supervision.

"The evidence showed that brutal and perverted acts were committed by some prisoners on others who were unable to defend themselves. These actions were unknown to the deputies in charge because the solid cell [tank]

doors were closed and the prisoners could neither be seen nor heard," the court stated.

## II. *The Constitutional Standard*

The trial court found that the conditions under which pretrial detainees were housed constituted punishment without due process of law in violation of article I, section 7 of the California Constitution, and the conditions under which sentenced prisoners were held constituted cruel or unusual punishment in contravention of article I, section 17. The court made no finding on whether the conditions violated the federal Constitution. A threshold question is whether the court applied the proper test.

The prisoners challenging conditions at the Indio jail include both pretrial detainees and sentenced prisoners serving terms of less than one year. As a matter of equal protection, conditions of confinement which violate the rights of sentenced prisoners also violate those of pretrial detainees, absent any justification for differential treatment. (*De Lancie* v. *Superior Court* (1982) 31 Cal.3d 865, 872 [183 Cal.Rptr. 866, 647 P.2d 142]; *Campbell* v. *McGruder* (D.C. Cir. 1978) 580 F.2d 521, 532-533.) It is not claimed in this case that any such justification exists.

Appellant contends that the correct standard to apply in determining whether the inmates were subjected to unconstitutional conditions is the federal standard, and that the superior court erred in failing to do so.

### A. *The Federal Standard*

The federal constitutional inquiry is phrased in terms of cruel and unusual punishment where sentenced prisoners are concerned, and in terms of punishment in violation of due process where the rights of the unconvicted are at stake. Speaking of pretrial detainees, the Supreme Court has said: "A court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose. [Citation.] Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on 'whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it].' [Citations.] Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.'" (*Bell* v. *Wolfish* (1979) 441 U.S. 520, 538-539 [60 L.Ed.2d 447, 468, 99 S.Ct. 1861].)

■ With regard to the cruel and unusual punishment clause of the Eighth Amendment, the court has stated: "The basic concept . . . is nothing less than the dignity of man. . . . [T]he words of the Amendment are not precise and . . . their scope is not static. The Amendment must draw its meaning from the evolving standards of decency that mark the progress of maturing society." (*Trop* v. *Dulles* (1958) 356 U.S. 86, 100-101 [2 L.Ed.2d 630, 642, 78 S.Ct. 590].) However, " 'Eighth Amendment judgments should neither be nor appear to be merely the subjective views' of judges. [Citation.] To be sure, 'the Constitution contemplates that in the end [a court's] own judgment will be brought to bear on the question of the acceptability' of a given punishment.' [Citations.] But such ' "judgment[s] should be informed by objective factors to the maximum possible extent." ' [Citation.] . . . Our conclusion in *Estelle* v. *Gamble* [(1976) 429 U.S. 97 [50 L.Ed.2d 251, 97 S.Ct. 285]] that deliberate indifference to an inmate's medical needs is cruel and unusual punishment rested on the fact . . . that 'an inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met.' [Citation.]" (*Rhodes* v. *Chapman* (1981) 452 U.S. 337, 346-347 [69 L.Ed.2d 59, 68-69, 101 S.Ct. 2392].)

## B. *The State Standard*

■ The same basic test employed in the federal courts is appropriate to assessing conditions of confinement challenged under the California Constitution. California courts have consistently employed federal decisions in assessing charges of unlawful conditions of confinement. (See *In re Price* (1979) 25 Cal.3d 448 [158 Cal.Rptr. 873, 600 P.2d 1330]; *In re Gallego* (1982) 133 Cal.App.3d 75 [183 Cal.Rptr. 715].) ■ As one court has recently stated, challenged conditions of confinement "will survive judicial review if substantial evidence supports the conclusion that the regulation is reasonably related to a legitimate governmental purpose. This is true whether the challenge is asserted by sentenced prisoners [citation] or pretrial detainees [citation]." (*Inmates of Sybil Brand Inst. for Women* v. *County of Los Angeles* (1982) 130 Cal.App.3d 89, 99 [181 Cal.Rptr. 599].)

■ We note, however, that the questions of federalism which exist when federal courts review the operations of state institutions are not present in cases such as this. (See, e.g., *Rizzo* v. *Goode* (1976) 423 U.S. 362 [46 L.Ed.2d 561, 96 S.Ct. 598].) Further, in assessing the "standards of decency" which are essential to this analysis, we think it appropriate that California courts should look chiefly to California standards and institutions for their guideposts.

It is significant that the California Legislature has enacted Penal Code section 2600, which provides: "A person sentenced to imprisonment in a

state prison may, during any such period of confinement, be deprived of such rights, and only such rights, as is necessary in order to provide for the reasonable security of the institution in which he is confined and for the reasonable protection of the public."

■ The California Supreme Court has held that section 2600's standard of reasonable necessity is "equally binding on county jail authorities." (*De Lancie* v. *Superior Court, supra,* 31 Cal.3d at p. 872.)

Moreover, section 6030 of the California Penal Code provides, in part:

"(a) The Board of Corrections shall establish minimum standards for local detention facilities by July 1, 1972. The Board of Corrections shall review such standards biennially and make any appropriate revisions.

"(b) The standards shall include, but not be limited to, the following: health and sanitary conditions, fire and life safety, security, rehabilitation programs, recreation, treatment of persons confined in local detention facilities, and personnel training."

The Board has promulgated the required minimum standards at 15 California Administrative Code section 1000 et seq.

■ The appellant argues that violations of the minimum standards for local detention facilities established by the Board of Corrections do not result in conditions which are, without more, constitutionally proscribed.

That is not what the court below held. The court found in its conclusions of law that the Title 15 standards set by the Board of Corrections "constitute contemporary notions of decency and are advisory in nature." While the court did say that "[t]he combined effect of the failure or inability of [appellant] to comply with minimum standards amount to punishment of pretrial detainees," the court went on to state that "the present conditions" under which both unsentenced and sentenced inmates were housed violated contemporary standards of decency. In ruling on appellant's motion to stay execution of the remedial order, the court wrote: "After an inspection of the county jails of Los Angeles, San Bernardino, Orange and San Diego, and a review of the evidence, this court is of the opinion that the Indio jail is far below the contemporary standards of decency." It is apparent that the

trial court did not rule that every departure from the Title 15 standards was tantamount to unconstitutional action.[1]

To the contrary, the court's approach to assessing the constitutionality of jail conditions comports well with Supreme Court precedent. The court looked to "objective indicia" to the "maximum possible extent," just as federal courts are instructed to do by *Rhodes* v. *Chapman* (452 U.S. at p. 346 [69 L.Ed.2d at p. 69]). It was particularly appropriate to look to the standards established by the California Board of Corrections because the Legislature intended that the "minimum standards" it mandated the Board of Corrections to adopt to represent something other than an ideal, outside the scope of attainment. This is borne out by Penal Code section 4015, which states: "The sheriff must receive all persons committed to jail by competent authority. The board of supervisors shall provide the sheriff with necessary food, clothing, and bedding, for such prisoners, which shall be of a quality and quantity *at least equal to the minimum standards and requirements prescribed by the Board of Corrections for the feeding, clothing, and care of prisoners* in all county, city and other local jails and detention facilities. Except as provided in the next section [relating to civil commitment], the expenses thereof shall be paid out of the county treasury." (Italics added.)

It was proper for the court to accord great weight to the Board of Corrections' minimum standards. Yet the court did not rely blindly on these standards as fixing constitutional minima. (See *Bell* v. *Wolfish, supra,* 441 U.S. at p. 543, fn. 27 [60 L.Ed.2d at p. 471].) It took extensive testimony and, in assessing the contemporary standards of decency which prevail in California, made visits unaccompanied by counsel to four other local jails. We cannot fault this approach.

---

[1]Appellant places great reliance on an advisory opinion of the Attorney General to support the thesis that the minimum standards set pursuant to Penal Code section 6030 have no legal force. (63 Ops.Atty.Gen. 227 (1980).) Even if the Attorney General is correct in concluding that the Board of Corrections has not been granted the authority to compel local detention facilities to meet its standards, it does not follow that the standards are meaningless for all purposes. Further, two California courts have addressed the standards promulgated pursuant to section 6030. The court in *In re Gallego, supra,* 133 Cal.App.3d at pages 86-87 assumed that prisoners might compel compliance with the minimum standards in a proper case. And the court in *Inmates of Sybil Brand Inst. for Women* v. *County of Los Angeles, supra,* 130 Cal.App.3d at page 108, indicated that compliance with Title 15 standards was mandatory.

Sections 1100 through 1121 of Title 15 may not be in fact applicable as such to the Indio jail, since Title 15 contains a partial exclusion clause for facilities which were in compliance with standards in effect at the time of initial planning. While we note that the court has reserved jurisdiction, it need not address the question of whether the Indio jail was in compliance at the time of its planning, because that is immaterial to the constitutional issue in this case, which is whether the Title 15 standards are relevant to contemporary standards of decency.

III. *The Findings*

■ The court found that conditions in the overcrowded, understaffed and badly outmoded Indio jail violated contemporary standards of decency. The appellant argues that the court should not have found the facility to be unconstitutionally overcrowded, relying on *Bell* v. *Wolfish* and *Rhodes* v. *Chapman.*

In each of these cases the Supreme Court considered arguments that overcrowded conditions at detention facilities rose to the level of constitutional violations, and in each case the court held that "double-celling" or exceeding a facility's design capacity was not *per se* constitutionally prohibited. (*Bell* v. *Wolfish, supra,* 441 U.S. at pp. 541-543 [60 L.Ed.2d at pp. 470-471] [pretrial detainees]; *Rhodes* v. *Chapman, supra,* 452 U.S. at pp. 347-350 [sentenced prisoners].) In each case the court directed its attention to the particular conditions at the facility in question.

The Metropolitan Correctional Center, at issue in *Bell* v. *Wolfish,* was constructed in 1975, and "differ[ed] markedly from the familiar image of a jail; there are no barred cells, dank, colorless corridors, or clanging steel gates. It was intended to include the most advanced and innovative features of modern design of detention facilities. As the Court of Appeals stated: '[I]t represented the architectural embodiment of the best and most progressive penological planning.' [Citation.]" (441 U.S. at p. 525 [60 L.Ed.2d at p. 459].)

The Southern Ohio Correctional Facility, at issue in *Rhodes* v. *Chapman,* was built in the early 1970's; it was described as " 'unquestionably a top-flight, first-class facility.'" (452 U.S. at p. 341 [69 L.Ed.2d at p. 65].) Both the *Bell* and *Rhodes* opinions stressed that under the conditions shown to exist at *those* facilities, no constitutional violation could be found. By clear implication, the court recognized that under other circumstances, overcrowding would be critical to a finding of unconstitutionality. (*Bell, supra,* 441 U.S. at p. 542 [60 L.Ed.2d at p. 470]; *Rhodes, supra,* 452 U.S. at pp. 347-348 [69 L.Ed.2d at pp. 69-70].) Conditions of confinement "*alone or in combination,* may deprive inmates of the minimal civilized measure of life's necessities." (*Rhodes, supra,* 452 U.S. at p. 347 [69 L.Ed.2d at p. 69], italics added; see conc. opn. of Brennan, J., *id.,* at pp. 362-363 [69 L.Ed.2d at pp. 78-79].)

The Indio jail, while not as crowded as the Southern Ohio Correctional Facility, which held 38 percent more inmates than its design capacity, was unquestionably overcrowded under the relevant measures. Title 15 of the California Administrative Code, section 1117, specifies that in multiple oc-

cupancy cells such as Tanks 1 through 4, there shall be 35 square feet of floor area per person. An additional 35 square feet of floor space per person is required for each dayroom. Thus, a tank containing three 8-inmate cells and a dayroom, should have 1,680 square feet of floor space. The Indio jail facility has approximately 1,286 square feet of floor space in Tanks 1 through 4. Even when these tanks hold no more than their rated capacity, therefore, they are too small. They have held as many as 46 persons.

When additional inmates beyond the rated capacity are assigned to these tanks, they are forced to sleep on the floors of the dayrooms. In these same dayrooms, at least 24 other inmates eat all their meals, shower, watch television, and pass time. The number of inmates forced to so exist in Tanks 1, 3, and 4 in the first half of 1981 averaged 13.7 per month.

Similarly, section 1118 of Title 15 provides that there shall be 50 square feet of floor space per person for all inmates housed in multiple occupancy rooms, such as Tanks 5, 6, and 7 of the Indio jail. Additionally, section 1119 specifies that there shall be 35 square feet of dayroom space for each inmate. Thus, such tanks should have a total of 1,190 square feet to accommodate a rated capacity of 14 inmates. Tanks 5 through 7 of the Indio jail have approximately 670 square feet for each 14 inmates. As noted above, population in the 14-inmate tanks reached as high as 26.

The Indio jail facility differs substantially from the "top-flight" and progressive facilities described in the two Supreme Court opinions. As seen above, the jail is "a very badly outmoded physical plant, in virtually all of the facilities," in the uncontradicted view of an expert from the Board of Corrections. Breakdown of plumbing was common; maintenance suffered. The problems of a badly designed, antiquated physical plant could only be exacerbated by relying on 31 individuals to do the work of 45 staff members.

Under the circumstances of overcrowding, understaffing, and an outmoded, inadequate facility, basing its decision on objective criteria set by law and on direct comparison with other jails, the trial court reasonably found that conditions at the Indio jail failed to meet contemporary standards of decency, and were unconstitutional.

IV. *The Remedial Order*

The superior court ordered as part of its remedy that the two hours of outdoors recreation per week offered unsentenced male inmates be brought into compliance with the three-hour minimum of section 1065 of

Title 15. Appellant argues this is inconsistent with *Inmates of Sybil Brand Inst. for Women, supra,* 130 Cal.App.3d 89, and two federal cases.

In *Inmates of Sybil Brand Inst.,* prisoners were permitted to go out-of-doors for 2 one-hour periods each week in a 40,950 square foot area, partially covered with grass. (130 Cal.App.3d at pp. 103-104.) Here, unsentenced prisoners are allotted two hours' exercise time "in a small fenced exercise yard at the rear of the jail." There were no cramped conditions at Sybil Brand—the jail was consistently *underpopulated. (Id.,* at p. 97.) The cases are dissimilar.[2]

In *Stewart* v. *Gates* (C.D. Cal. 1978) 450 F.Supp. 583, a federal court found two and one-third hours of outdoor exercise time per week "barely sufficient," and urged jail officials "to see if this minimal time cannot be expanded." *(Id.,* at p. 587.) In *Rutherford* v. *Pitchess* (C.D. Cal. 1978) 457 F.Supp. 104, the same court noted that several federal decisions have required one hour per day as a minimum for outdoor recreation, and stated that it would "retain jurisdiction in order to assess the progress towards such goal. In the meantime, all prisoners . . . must be allowed not less than two and one-half hours of [outdoor] recreation per week." *(Id.,* at p. 111.)

The justification offered here for limiting the outdoor recreation time of unsentenced male inmates (as distinct from all other inmates) to two hours per week was staff shortages. In view of all the circumstances, the trial court rationally concluded that Title 15's minimum standard for recreation warranted enforcement in this case.

Similarly, appellant has advanced no legitimate purpose which might excuse noncompliance with Title 15's regulations governing clothing and linen exchanges. (15 Cal. Admin. Code, §§ 1260-1263, 1270-1272; see Pen. Code, § 4015, quoted *supra.*) The trial court properly ordered compliance.

■■■ The superior court ordered as part of its remedy that the solid metal security doors to the housing units "remain open except in emergency situations relating to jail security as determined by the jail commander or his designee. . . . Other suitable plans for management of the housing unit doors may hereafter be submitted by [appellant] for approval by the court." Appellant attacks this provision, arguing first, that the underlying issue did not rise to constitutional proportions, and second, even if it had, the court should have deferred to the judgment of the jail administrators.

---

[2] The question of whether recreational opportunities at Sybil Brand Institute complied with section 1065 of Title 15 does not appear to have been raised.

As seen above, each of the 8 tanks in the Indio jail is separated from the central corridor by a solid metal door. In Tanks 1 through 4, prisoners are separated from the central corridor by the doors to the 8-inmate cells within each tank, in addition to the metal security doors, and in Tanks 5 through 8, there are interior housing unit doors as well as the metal doors. Of the five county jail facilities visited by the court, the Indio jail was the only one in which visual supervision of inmates in the housing units was not practicable from outside the units. The evidence showed that such supervision was the most effective way to deter assaults by prisoners on other prisoners. (See Tit. 15, Cal. Admin. Code, § 1027.) The doors impeded the transmission of sound, so inmate cries for help could not generally be heard. The noise created by opening the solid metal doors eliminated the element of surprise and damaged the effectiveness of roving patrols. The most effective way to achieve visual supervision in the Indio jail was to leave the solid metal doors open.

There is plainly a constitutional issue here. In *Estelle* v. *Gamble, supra,* the court found that deliberate indifference to an inmate's medical needs was unconstitutional, reasoning that inmates rely on prison authorities to meet their medical needs; "if the authorities fail to do so, those needs will not be met." (429 U.S. at p. 103 [50 L.Ed.2d at p. 259].) The same reasoning applies to physical security and the protection of the laws. To allow an abandonment of supervision which results in assault cannot be justified as a legitimate incident of punishment.

The jail's incident log for the first half of 1981 showed 48 reported incidents. At least half of these appear to involve violent crime (perhaps more do—the classification system is ambiguous). The jail commander estimated that about 80 percent of all incidents were reported. While in the opinion of appellant this may be a "low" number of incidents, we think the trial court was justified in disagreeing. Extrapolating from the half-year period, an inmate serving a one-year sentence at the Indio jail would have an approximately one-in-three chance of becoming the victim of a violent incident during his stay. Evidence supported the trial court's belief that the least violent prisoners who were jailed for relatively minor offenses were the most likely assault victims.

However, we are aware that security considerations in detention facilities are " 'peculiarly within the province and professional expertise of corrections officials . . . .' " (*Jones* v. *North Carolina Prisoners' Union* (1977) 433 U.S. 119, 128 [53 L.Ed.2d 629, 640, 97 S.Ct. 2532]; accord, *Bell* v. *Wolfish, supra,* 441 U.S. at p. 551 [60 L.Ed.2d at p. 476]; *In re Price, supra,* 25 Cal.3d at p. 455.) Appellant vigorously opposed the proposed order to leave the metal doors open on several grounds. Appellant argued

that inmates might force open the food hatches of the cell doors in Tanks 1 through 4, or break the glass ports of the interior housing doors of Tanks 5 through 8, and thereby gain access to the entire jail. This prospect had an effect on staff morale. Appellant contended that leaving the door open facilitated the movement of contraband through the jail. The open doors also made it possible for inmates to create safety hazards by throwing food and other objects into the central corridor. Leaving the doors open further adversely impacted the air conditioning and heating functions.

The strongest support for the court's ruling that the doors remain open is empirical. Pursuant to the court's order, the metal doors were left open in September and October 1981. The incident log for those months showed three reported assaults, as opposed to six for the same months in 1980. This was despite an average jail population about 10 percent higher in September and October 1981 than during the same months the previous year.

This court did not stay that portion of the trial court's order requiring that the metal doors remain open. Assuming no modification of the order has occurred, the jail administrators have now had over 20 months' experience with the practice mandated by the court. We modify the trial court's order to provide that the court shall promptly reconsider its order regarding the metal security doors, giving deferential consideration to the experience of the jail administrators, and any alternatives the appellant wishes to submit.

The remedial order which the trial court issued directed that each housing unit at the Indio jail contain no more than the rated capacity of that unit as set by the Board of Corrections, "except in emergency situations with written notice . . . delivered to the court within 48 hours of the situation"; that no prisoner be permitted to sleep on the floor; that the staffing of the jail be increased to 45 persons, effective 90 days from the date of the order; that staff members patrol the tanks at variable intervals not to exceed 30 minutes; that the doors to the housing units remain open except in emergency situations, as noted above; that a formal procedural manual be completed "with all reasonable diligence"; that the provisions of Title 15 be enforced; that a plan be prepared within 30 days outlining procedures for the management of an "extraordinary influx" of inmates; and that appellant request the assistance of the Board of Corrections in evaluating the facility. The court directed that a formal review of the order would occur in 120 days, and expressly reserved jurisdiction to hear arguments and take evidence regarding modification of the order.

Aside from the provisions of the order requiring that housing units contain no more than their rated capacity except in emergencies, and directing that staffing be brought up to the level adjudicated essential for compliance with

appellant's duties, which this court stayed, the order has been effective since December 1981.

■ Appellant's final argument is that the court extended "either no time or insufficient time" to appellant in which to implement the provisions of the order which were stayed, and hence abused its discretion.

The trial court did not fix an inflexible cap on population at the Indio facility. Rather, the court left the determination of whether an emergency existed with the jail commander, merely requiring that the court be informed. The order was not a directive that the appellant turn prisoners into the street when a certain population figure was reached, but was a requirement that the jail administrators make a serious good-faith effort, working in concert with the court, to minimize jail overcrowding to the greatest possible extent in the short term, and to develop alternatives to meet long-term demands. The court did not abuse its discretion.

The appellant was ordered to fill both sworn and nonsworn positions. The jail commander testified that "generally, it takes anywhere between three to five weeks to fill . . . non-sworn position[s]." Plainly, the specified ninety days in which to fill these positions was not unreasonable. The jail commander indicated that it would take up to six months to fill sworn positions, providing no sheriff's academy graduates or lateral-entry officers were available. The trial court's order is modified to reflect that if no unassigned sworn personnel are available, appellant shall be allowed six months to fill the sworn positions. We reject the inmates' suggestion that the appellant be required to transfer presently assigned sworn personnel from field positions to comply with the court's order.

The remaining portions of the remedial order have not been challenged on appeal.

The trial court's order is modified to provide for prompt reconsideration of the determination that the metal security doors remain open, and to reflect that if no unassigned sworn personnel are available to fill vacant staff positions, appellant is allowed six months from the date of this opinion to fill such positions. The partial stay of the superior court's order is dissolved, and the trial court's order is affirmed as modified.

McDaniel, J., and Rickles, J., concurred.