Filed 10/20/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| In re IVAN VON STAICH on Habeas Corpus. | A160122 |
| --- | --- |

Petitioner Ivan Von Staich is incarcerated at San Quentin State Prison pursuant to 1986 convictions for second degree murder with use of a firearm and attempted murder. Petitioner has been in the custody of the California Department of Corrections and Rehabilitation (CDCR) since 1989, serving a sentence of 17 years to life for the murder consecutive to a 13-year sentence for the attempted murder.

In May of this year, petitioner, in propria persona, filed a petition for writ of habeas corpus alleging CDCR was not adequately prepared to respond to a possible outbreak of COVID-19, the disease caused by the novel coronavirus, at San Quentin. Shortly thereafter, San Quentin suffered a devastating outbreak of COVID-19 that infected approximately 75 percent of the inmate population and dozens of prison staff in just weeks. This court appointed counsel, who filed a supplemental petition on July 23, 2020.

Petitioner is 64 years of age and suffers respiratory problems resulting from bullet fragments lodged in his left lung. In a declaration, petitioner states that at the time he commenced this proceeding, he and a 65-year-old cellmate, both of whom had tested positive for COVID-19 (although petitioner

1

was asymptomatic), were placed on the fourth tier of west block in a cell which, like others in that facility, was "so small that you can touch the walls with your hands." The declaration states that "[p]rotecting oneself from infection COVID-19 in this open cell is impossible" because "there is no opportunity to engage in social distancing."

After informal response and reply, we issued an order to show cause on August 14, 2020, directing the Warden of San Quentin Prison (Warden) to show cause why relief should not be granted and to transfer petitioner to a suitable quarantine location pending disposition of this proceeding. The Attorney General's return and petitioner's traverse followed.

Petitioner, who seeks placement in a residential facility supervised by CDCR that has already accepted him subject to a brief period of quarantine, maintains his continued incarceration at San Quentin violates the prohibition against cruel and unusual punishment embodied in article I, section 17 of the California Constitution and the Eighth Amendment to the United States Constitution. In particular, petitioner alleges respondents acted with deliberate indifference to the risk of substantial harm to inmates by failing to immediately reduce the population of San Quentin by releasing or transferring at least 50 percent of the population of the prison, in accordance with the recommendation of public-health experts who had been asked to advise CDCR on measures to combat COVID-19 considered necessary to " 'protect the health of prisoners, the health of correctional facility staff, the health of health care staff, and the health of the community as a whole.' " On the same basis, petitioner also seeks declaratory relief for other similarly situated San Quentin inmates.

We agree that respondents—the Warden and CDCR—have acted with deliberate indifference and relief is warranted.

2

**FACTS**

In late February of this year, California began experiencing a public health crisis due to the spread of COVID-19. On March 4, 2020 (all dates in this opinion are in that year), Governor Newsom declared a state of emergency to help the state prepare for the spread of the virus.[1] The World Health Organization declared COVID-19 a pandemic on March 11, noting "the alarming levels of spread and severity" and the "alarming levels of inaction" in response to the virus.[2] On March 19, the Governor directed all Californians to stay home to prevent the spread of the virus. (Governor's Exec. Order N-33-20 (Mar. 19, 2020) <https://www.gov.ca.gov/wp-content/uploads/2020/03/3.19.20-attested-EO-N-33-20-COVID-19-HEALTH-ORDER.pdf> [as of Oct. 16, 2020].) Since then, the state, counties, and localities have implemented a variety of measures to control the spread of the virus, with varying degrees of success.

Absent a vaccine or an effective treatment, the best way to slow and prevent spread of the virus is through social or physical distancing, which involves avoiding human contact, and staying at least six feet away from others. Even vigilant efforts to improve personal hygiene are not enough to slow the spread of COVID-19. Consequently, most institutions in this country have either dramatically reduced the number of people in close quarters or closed entirely.

---

[1] Office of the Governor Gavin Newsom, Proclamation of a State of Emergency (Mar. 4, 2020) <https://www.gov.ca.gov/wp-content/uploads/2020/03/3.4.20-Coronavirus-SOE-Proclamation.pdf> (as of Oct. 16, 2020).

[2] World Health Organization, Coronavirus Disease 2019 (COVID-19) Situation Report – 51 (Mar. 11, 2020) <https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200311-sitrep-51-covid-19.pdf?sfvrsn=1ba62e57_10> (as of Oct. 16, 2020).

Despite the efforts of many state agencies to control the transmission of COVID-19 in California, 826,784 persons in the state had been infected as of October 4, 2020 and 16,149 deaths had resulted.  Thousands of new cases continue to be reported each day.[3]

Prisons and jails have long been associated with inordinately high transmission probabilities for infectious diseases.  Early on, physicians, public health officials, and the national Centers for Disease Control and Prevention (CDC) sounded the alarm that prisons and jails could become the "epicenter of the [COVID-19] pandemic."  (E.g., Amanda Klonsky, *An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues*, N.Y. Times (Mar. 16, 2020) <https://nyti.ms/3aycWX4> [as of Oct. 16, 2020].)  The CDC's lengthy and detailed "Guidance for Correctional and Detention Facilities" repeatedly emphasizes the vital nature of social distancing for reducing transmission of the virus."[4]

Infections transmitted through droplets, like COVID-19, are particularly difficult to control in correctional facilities, as adequate physical distancing and decontamination of surfaces is usually impossible.  Prison and jail populations are at additional risk due to double celling and the existence of dormitories, dining halls, reception centers, gymnasiums, and other congregate spaces are accessible to most inmates, including aged and chronically ill prisoners.

---

[3] Tracking COVID-19 in California <https://covid19.ca.gov/state-dashboard/> (as of Oct. 16, 2020).

[4] CDC, Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities (updated Oct. 7, 2020.) <https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html> (as of Oct. 16, 2020).

Physicians and public health authorities regularly warn that prisons " 'are in no way equipped to deal with an outbreak once it gets in.' If an institution is already operating at far beyond its capacity, it is going to be very difficult to find areas where prisoners with suspected COVID-19 can be isolated."[5] According to a New York Times database, as of June 2020, nine of the 10 largest known clusters of the virus in the United States were inside correctional institutions.[6]

Recognizing the risk to state prison inmates caused by COVID-19, CDCR took steps to control the introduction of virus and infection in the state's 35 adult prisons. To reduce the prison population, it suspended the intake of prisoners from county jails and juvenile halls to adult prisons and instituted programs to expedite the release of certain classes of prisoners. In addition, the CDCR requires all inmates and staff to wear facial barriers, provided guidance on physical distancing, and enhanced its sanitization procedures.[7]

Despite these efforts, there have so far been more than 2,200 confirmed cases of COVID-19 among San Quentin inmates and 28 deaths.[8] There have

---

[5] Burki, *Prisons are "in no way equipped" to deal with COVID-19* (May 02, 2020) 395 The Lancet 1411 <https://www.thelancet.com/action/showPdf?pii=S0140-6736%2820%2930984-3> (as of Oct. 16, 2020).

[6] Williams and Griesbach, *San Quentin Prison was Free of the Virus. One Decision Fueled an Outbreak.* N.Y. Times (June 30, 2020) (hereafter Williams & Griesbach) <https://www.nytimes.com/2020/06/30/us/san-quentin-prison-coronavirus.html> (as of Oct. 16, 2020).

[7] CDCR, COVID-19 Response Efforts <https://www.cdcr.ca.gov/covid19/covid-19-response-efforts/> (as of Oct. 16, 2020).

[8] CDCR, Population COVID-19 Tracking <https://www.cdcr.ca.gov/covid19/population-status-tracking/> (as of Oct. 16, 2020).

also been 298 confirmed cases among San Quentin staff, including one death.[9] The infection and mortality rates at San Quentin are higher than the rate for prisons statewide, and considerably higher than the rates for California's general population.[10]  By all accounts, the COVID-19 outbreak at San Quentin has been the worst epidemiological disaster in California correctional history. And there is no assurance San Quentin will not experience a second or even third spike, as it did during the Spanish flu pandemic in 1918, which according to the resident prison physician of San Quentin at the time consisted of three distinct epidemics, in April, October, and November of that year.  (L. L. Stanley, *Influenza at San Quentin Prison, California* (May 9, 1919) vol. 34, No. 19, p. 996 <https://www.jstor.org/stable/4575142? seq=1#metadata_info_tab_contents>.)

---

[9] CDCR/CCHCS COVID-19 Employee Status <https://www.cdcr.ca.gov/covid19/cdcr-cchcs-covid-19-status/> (as of Oct. 16, 2020).

[10] CDCR reported that as of October 16, there were 15,274 cases of COVID-19 (560 of which were classified as "active, in custody in California's 35 prisons"), and 70 inmate deaths.  (CDCR, Population COVID-19 Tracking <https://www.cdcr.ca.gov/covid19/population-status-tracking/> [as of Oc. 16, 2020], as well as 3,969 cases of COVID-19 among prison staff, and 10 staff deaths; CDCR/CCHCS COVID-19 Employee Status <https://www.cdcr.ca.gov/covid19/cdcr-cchcs-covid-19-status/> [as of Oct. 16, 2020].)

A September 2020 report by the National Commission on COVID-19 and Criminal Justice found that the infection rate in California prisons is 4.5 times the infection rate for California's general population and that the inmate death rate is more than twice that of California's general population.  (Schnepel, National Commission on COVID-19 and Criminal Justice, COVID-19 in U.S. State and Federal Prisons.  (Sept. 2020) table 2 <https://cdn.ymaws.com/counciloncj.org/resource/resmgr/covid_commission/FINAL_Schnepel_Design.pdf> (as of Oct. 16, 2020).

The catalyst of the outbreak of COVID-19 infections and deaths was the transfer by CDCR of 121 inmates from the California Institution for Men (CIM) to San Quentin, which was part of an effort to control the growing number of infections at CIM. CIM had been the site of the largest COVID-19 outbreak in a California state prison, while San Quentin had reported zero cases. The CIM inmates sent to San Quentin had not been tested for up to a month before the transfer. Some of the transferred inmates immediately felt ill after entering San Quentin and several tested positive shortly after arrival.[11] For days, the transferred inmates used the same showers and ate in the same dining hall as other San Quentin inmates. (Williams & Griesbach, *supra,* N.Y. Times <https://www.nytimes.com/2020/06/30/us/san-quentin-prison-coronavirus.html> [as of Oct. 16, 2020].)

The delivery of medical care in California prisons is overseen by a receiver appointed by the federal district court in a long-running civil action concerning inadequate medical care due to severe overcrowding in the California correctional system. (*Plata v. Schwarzenegger* (9th Cir. 2010) 603 F.3d 1088.) The receiver was appointed because the state had failed to comply with consent orders aimed at correcting deficiencies in medical care. (*Id.* at p. 1090.) The underlying litigation involves two class actions, now known as *Plata v. Newsom* (N.D.Cal., No. 01-cv-01351-JST), concerning medical care, and *Coleman v. Newsom* (E.D.Cal., No. 2:90-cv-00520 KJM DB P), concerning mental health care, which resulted in the United States Supreme Court affirming the decision of a three-judge district court requiring California to reduce its prison population to 137.5 percent of design capacity in order to

---

[11] Cassidy and Fagone, *200 Chino inmates transferred to San Quentin, Corcoran. Why weren't they tested first?* San Francisco Chronicle (June 8, 2020) <https://www.sfchronicle.com/crime/article/Coronavirus-and-prisons-Prisoners-went-weeks-15325787.php> (as of Oct. 16, 2020).

remedy ongoing violations of the cruel and unusual punishment clause. (*Brown v. Plata* (2011) 563 U.S. 493, 539.)

After the outbreak of COVID-19 at San Quentin, the receiver asked Dr. Brie Williams, director of the University of California San Francisco (UCSF) Criminal Justice and Health Program and Amend: Changing Correctional Culture, and Dr. Stefano Bertozzi, dean emeritus of the University of California Berkeley School of Public Health, and colleagues selected by them, to visit the facilities at San Quentin and provide guidance on how CDCR could contain the skyrocketing transmission of COVID-19 at that prison.

The UCSF experts provided the receiver and respondents a document entitled Urgent Memo, which assigned central importance to the prompt reduction of the population of San Quentin Prison by at least 50 percent of current capacity. (Williams & Bertozzi, Urgent Memo, COVID-19 Outbreak: San Quentin Prison (June 15, 2020) (hereafter Urgent Memo) <https://amend.us/wp-content/uploads/2020/06/COVID19-Outbreak-SQ-Prison-6.15.2020.pdf> [as of Oct. 16, 2020].)

After outlining the vulnerabilities of inmates, staff, and others in the community, the Urgent Memo emphasized the immediate need to drastically reduce the inmate population: "There are currently 3547 people in total incarcerated at San Quentin, approximately 1400 of whom have at least one COVID-19 risk factor (as do many, unknown, staff members). This means these individuals are at heightened risk of requiring ICU treatment and/or mortality if infected. . . . Given the unique architecture and age of San Quentin (built in the mid 1800s and early 1900s), there is exceedingly poor ventilation, extraordinarily close living quarters, and inadequate sanitation. **We therefore <u>recommend that the prison population at San Quentin</u>**

8

**be reduced to 50% of current capacity (even further reduction would be more beneficial) via decarceration**; this will allow every cell in North and West Blocks to be single-room occupancy and would allow leadership at San Quentin to prioritize which units to depopulate further, including the high-risk reception center and gymnasium environments. It is important to note that we spoke to a number of incarcerated people who were over the age of 60 and had a matter of weeks left on their sentences. It is inconceivable that they are still in this dangerous environment." (Urgent Memo, *supra,* at p. 3, emphasis in original.)

The Urgent Memo expressed particular concern about north block and west block, where petitioner was then housed in a five by nine foot cell with another inmate who had also tested positive: "**North Block and West Block** have cells with open-grills, and are each 5-tier buildings with a capacity of 800 persons. Ventilation is poor—windows have been welded shut and the fan system does not appear to have been turned on for years; heat on the far side of the building can be stifling. Over 50% of those incarcerated in these units have at least 1 COVID-19 risk factor, and an alarming 300 have 4 or more COVID-19 risk factors. An outbreak in North and West Blocks could easily flood—and overwhelm—San Quentin as well as Bay Area hospitals." (Urgent Memo, *supra,* at pp. 3–4.)

Ultimately, the Urgent Memo cautioned, "[g]iven San Quentin's antiquated facilities, poor ventilation, and overcrowding, **it is hard to identify any options at San Quentin where it is advisable to house high-risk people with multiple COVID-19 risk factors for serious morbidity or mortality.** Again, for these reasons it will be exceedingly hard for medical staff to keep people safe from contracting COVID-19 at San Quentin and, once infected, it will be very hard to ensure that they do not pass

9

the infection on to others with high health risks or experience rapid health declines themselves. **San Quentin is an extremely dangerous place for an outbreak, everything should be done to decrease the number of people exposed to this environment as quickly as possible.**" (Urgent Memo, *supra*, at p. 6, emphasis in original.)

As petitioner's exhibits demonstrate, other eminent public health experts endorsed the conclusion of the Urgent Memo that inmates of San Quentin could be protected against the risks presented by COVID-19 only if the population of San Quentin was drastically reduced with dispatch.

The declaration filed by Dr. Chris Beyrer, professor of epidemiology, international health, and medicine at the Johns Hopkins Bloomberg School of Public Health, states it is "self-evident from the 75% infection rate and rates of morbidity and mortality at San Quentin, that its response to the outbreak there has been a failure to protect the lives of inmates and staff. Had San Quentin done nothing, the rates of infection there would have been roughly the same. It is a disaster that could have been avoided by releasing substantial numbers of people as UCSF experts repeatedly recommended." Dr. Beyrer believes the "disaster" at San Quentin is not yet over, since "a substantial portion of the population could still get COVID-19, become seriously ill or die. At present, San Quentin remains unsafe for inmates, staff, and others coming into the facility. [¶] Releasing as many prisoners as possible (50% or more) from San Quentin was, and remains, important to protect the health of prisoners, the health of correctional facility staff, the health of the health care staff, and the health of the community as a whole."

In another declaration, Dr. Peter Chin-Hong, director of the UCSF medical school's Infectious Diseases/Immunocompromised Host and Transplant Infectious Diseases Program, agrees that reduction of the San

Quentin population on the scale recommended by the Urgent Memo "is necessary to facilitate the separation and distancing among inmates required for minimal protection from the virus." In the event the prison does not take those steps, he says, "San Quentin cannot be considered a safe environment for the confinement of any inmate such as Mr. Von Staich who is age 60 or older or who has any pre-existing medical condition . . . which renders him especially vulnerable to COVID-19 should he contract the disease."

Petitioner also presents a letter dated August 10, 2020, from Dr. Martin Willis, the Marin County Public Health officer, to the judge presiding over a consolidated writ proceeding brought by other San Quentin inmates in the Marin County Superior Court. Dr. Willis, a member of the Incident Command Response Team established at San Quentin on July 3, 2020, was "based at the prison for five days and participated in at least 10 tours within the housing units to assess conditions and medical care capacity within the facility." Dr. Willis warned that transmission of COVID-19 remains a challenge, and "those 1200 inmates who have not yet been infected are at significant risk of becoming infected. Despite significant progress compared to the poor initial standards, the environment itself presents barriers that are nearly insurmountable within the existing architecture. The larger cell blocks, with pairs of men in hundreds of 4 x 8 foot cells with open bars, opening into common space with limited ventilation, have proven to be an especially high risk environment to all living there. Attack rates—defined as the proportion of individuals infected in a given shared setting—have been extremely high and well above 50% in many of the buildings."

Dr. Willis continued, "[t]aken together these factors sum to a picture of significant ongoing risk related to COVID-19 for inmates at San Quentin State Prison, despite progress over the past month to shift from a wholly under-

11

prepared and under-resourced system.  Most of the ongoing risk is attributable to factors that can, with concerted effort and resources, be addressed over time, but cannot be corrected in the short term.  These include addressing crowding of inmates in single large settings, ensuring public health experts have institutional authority to manage outbreaks, and expanding clinical services in prisons to ensure timely access for all healthcare needs.

The key point in the Urgent Memo and declarations submitted by other physicians is that transmission of COVID-19 at San Quentin could not be arrested without physical distancing, and given the crowding in San Quentin and its antiquated infrastructure, freeing up the space necessary for effective physical distancing would require reducing the inmate population by at least 50 percent.

CDCR did not implement the 50 percent reduction deemed essential by the Urgent Memo solicited in its behalf by the federal receiver, but rather established a "unified command center" at the prison "to coordinate custody and medical response," established alternative care sites within existing San Quentin facilities, distributed personal protective equipment (PPE) to inmates and staff, implemented inmate and staff testing, increased staffing and cleaning procedures, and reduced its population "through the suspension of intake from county jails, expedited releases and natural releases from the prison."  As of August 12, 2020, the inmate population at San Quentin had been reduced to 3,129 from 4,051 in March 2020, a reduction of 922 inmates (or 23%).  (CDCR, San Quentin State Prison Responses <https://www.cdcr.ca.gov/covid19/san-quentin-state-prison-response/> [as of Oct. 16, 2020]; <https://www.cdcr.ca.gov/covid19/san-quentin-state-prison-response/#PCT> [as of Oct. 16, 2020].)  This reduction was accomplished, in part, by suspending intake at San Quentin from county jails, which has

12

increased the presence of COVID-19 in those local facilities, and is not likely sustainable.

Petitioner maintains CDCR's rejection of the views on necessary population reduction set forth in the Urgent Memo, constitutes the "deliberate indifference" necessary to sustain claims under the cruel and/or unusual custody provisions of the state and federal Constitutions. (*Estelle v. Gamble* (1976) 429 U.S. 97, 103; *Inmates of the Riverside County Jail v. Clark* (1983) 144 Cal.App.3d 850, 859; *Hutto v. Finney* (1978) 437 U.S. 678, 682.) According to petitioner, because the risks to inmate health and lives were well known to respondents, and obvious, rejection of the conclusion of the scientists who submitted the Urgent Memo must be deemed reckless under the analysis prescribed by the United States Supreme Court in *Farmer v. Brennan* (1994) 511 U.S. 825 (*Farmer*).)

## DISCUSSION

### I.

It is necessary to first address respondents' claims that the petition should be dismissed because petitioner's claim is "duplicative" of that in *Plata v. Newsom* (N.D.Cal. Apr. 17, 2020, No. 01-cv-01351-JST), and should be decided in that federal proceeding or, alternatively, remanded to the Marin County Superior Court in the interest of judicial economy and to accommodate any need for an evidentiary hearing.

### A.

### *This Petition is Not Duplicative*

Respondents argue we must defer to the pending federal civil rights action in *Plata*, because petitioner is a member of the class certified in that case and the federal district court is "actively monitoring CDCR's continued efforts to contain the spread of COVID-19." Respondents contend that

13

"maintaining the duplicative action would waste judicial resources and could result in conflicting decisions" and petitioner must therefore rely solely on the federal district court to enforce his constitutional rights.

We cannot agree that the *Plata* litigation is "an adequate substitute for a present determination of [petitioner's] rights in a California court" (*Farmland Irrigation Co. v. Dopplmaier* (1957) 48 Cal.2d 208, 215–216), as respondents claim. The litigation in *Plata* was commenced two decades ago, and it has been nine years since the United States Supreme Court declared that deficient medical care attributable to overcrowding amounted to cruel and unusual punishment. (*Brown v. Plata, supra,* 563 U.S. at p. 562.) While the issues overlap in certain respects, this case and *Plata* address fundamentally different subjects. *Plata* is concerned with ongoing overcrowding in the overall correctional system and its effect on medical care in general, not limited to any specific medical needs. The petition before us, on the other hand, is concerned with the population of only one prison, the most antiquated in the state, and the problem it presents is very specific: the containment in that dilapidated prison of a highly contagious and deadly virus that has already led to the deaths of 28 inmates and one employee at San Quentin. Moreover, the measures petitioner seeks are not permanent, as are those sought in *Plata*, but only for as long as the pandemic continues and physical distancing remains necessary.

These distinctions came into play when, several months ago, the plaintiffs in *Plata* and *Coleman* asked the three-judge panel to order a reduction in the statewide prison population in order to limit the effect of the coronavirus in all state prisons. (*Coleman v. Newsom* (N.D.Cal. 2020) 455 F.Supp.3d 926.) This request was denied on the ground "that any constitutional violation in Defendants' current response to the COVID-19 crisis

is different, in both nature and degree, from the violations underlying the 2009 population cap order [in *Plata* and *Coleman*]. *That order was never intended to prepare Defendants to confront this unprecedented pandemic.* Nor could it have, given that the entire world was unprepared for the onslaught of the COVID-19 virus." (*Id.* at p. 933, italics added.)

Additionally, unlike this case, the litigation in *Plata* is subject to the Prison Litigation Reform Act (PRLA), which deprives a federal district court judge of the authority to order the release of prison inmates; release can only be ordered by a three-judge panel of the district court. (18 U.S.C. § 3626.) This was one of the reasons the judge in *Plata* denied relief when the plaintiffs presented their motion for systemwide relief to the individual district court following the three-judge panel's denial without prejudice to pursuing relief in the individual judge forum: The court explained it could not order the reduction in prison population the plaintiffs sought because a "prisoner release order" could only be issued by a three-judge panel. (*Plata v. Newsom* (N.D.Cal. 2020) 445 F.Supp.3d 557, 559, 569.)[12] State courts are not subject to the restrictions of the PRLA.

Finally, as the United States Supreme Court has said, state courts "have the duty to and competence to vindicate rights secured by the Constitution in state criminal proceedings" and " 'should have the first opportunity to review [constitutional claims] and provide any necessary relief.' " (*Williams v. Taylor* (2000) 529 U.S. 420, 436–437, quoting *O'Sullivan v. Boerckel* (1999) 526 U.S. 838, 844.) Another Division of this Appellate District recently noted that the

---

[12] The *Plata* court also denied relief because the plaintiffs had not yet demonstrated an Eighth Amendment violation based on CDCR's *systemwide* response to COVID-19, and for that reason declined to sua sponte request the convening of a three-judge court. (*Plata v. Newsom, supra,* 445 F.Supp.3d at pp. 559, 569, 571.)

pendency of a related federal action challenging CDCR actions "does not lessen" a California court's "authority, and duty, to provide effective [habeas] relief . . . ." (*In re Morales* (2013) 212 Cal.App.4th 1410, 1430, fn. 13.)

B.

### *It is Unnecessary to Remand this Case to the Superior Court*

Alternatively, respondents argue that judicial economy requires us to allow the Marin County Superior Court to consider petitioner's claims in the first instance. Contemporaneous with the proceeding here, the Marin County court is considering dozens of consolidated habeas petitions brought by other San Quentin inmates challenging the conditions of their confinement in light of the COVID-19 outbreak. Respondents are correct that we have discretion to deny a petition for writ of habeas corpus without prejudice so that the superior court may consider it in the first instance. (*In re Steele* (2004) 32 Cal.4th 682, 692; *In re Hillery* (1962) 202 Cal.App.2d 293, 294.) We decline to exercise that discretion here, however, for several reasons.

First, petitioner initially filed his petition in the Marin County Superior Court and it was denied. We thus see nothing to be gained by requiring petitioner to renew his claims in the superior court now, especially when the parties have presented us with complete briefing, a developed evidentiary record, and oral argument.

More importantly, as we later explain in greater detail, there is no need for an evidentiary hearing in this case. Though respondents' return to the petition "denies that CDCR's decision not to immediately release half the population from San Quentin Prison following the recommendation of local professors establishes deliberate indifference on the part of CDCR," "that social distancing is impossible at San Quentin" and "that prison officials are unable to meaningfully isolate those with symptoms to prevent the spread of

16

infection," these statements are conclusions the Attorney General has failed to support with any factual allegations contradicting petitioner's allegations that reduction of the San Quentin population by at least half is essential to protect inmates' health, much less evidence supporting such allegations. It is respondents' burden to "*allege additional facts* that *contradict*" the allegations of the petition and " 'where appropriate, . . . provide such documentary evidence, affidavits, or other materials as will enable the court to determine which issues are truly disputed.' " (*People v. Duvall* (1995) 9 Cal.4th 464, 476, 483 (*Duvall*).) When the state offers " 'nothing more in support of their claim that petitioner's confinement is lawful than a general denial of his [factual] allegation[s],' " then " '[b]y alleging only a conclusionary statement of ultimate fact in their return, the People have indicated a willingness to rely on the record.' [Citation.] . . . '[And] the merits of petitioner's claim can be reached without ordering an evidentiary hearing.' " (*Duvall,* at p. 479, quoting *In re Lewallen* (1979) 23 Cal.3d 274, 278; accord, Pen. Code, § 1485.5.)[13]

The Urgent Memo provided to the receiver and CDCR lauds Dr. Alyson Pachynsky, CDCR's chief medical executive, and Dr. Shanon Garrigan, CDCR's chief physician and surgeon, "for doing everything in their power to prepare for an unavoidable COVID outbreak," but states that "even their efforts and those of other health care staff, are "not enough to meet the needs at San Quentin." If CDCR's most senior physicians, who are deeply involved in CDCR's efforts to contain COVID-19 at San Quentin, or any other qualified scientists, felt the decarceration deemed essential by the UC experts was unnecessary, one would expect the Attorney General to have presented that evidence. He did not, nor does the return allege facts contradicting the

---

[13] Subsequent statutory references will be to the Penal Code except as otherwise specified.

17

experts' conclusions, including the need for a 50 percent reduction in the prison population.

The situation at San Quentin is clearly exigent, as lives are at stake, and the prompt response of an appellate court will enable the Marin County Superior Court to act with greater authority and more expeditiously than it otherwise might. The issue before us is simply whether respondents' disregard of the experts' conclusion that a 50 percent population reduction is essential constitutes the "deliberate indifference" necessary to sustain petitioner's constitutional claim. That issue is one of law, not fact.

## II.

## A.

### *CDCR Treated Inmates' Medical Needs with Deliberate Indifference*

The Eighth Amendment to the United States Constitution and article I, section 17 of the California Constitution both require correctional officials to provide inmates adequate medical care. (*Estelle v. Gamble, supra,* 429 U.S. at p. 103; *Inmates of the Riverside County Jail v. Clark, supra,* 144 Cal.App.3d at p. 859.) In order to prevail on a constitutional claim of inadequate care, a prisoner must establish that the responsible prison official treated him with "deliberate indifference to serious medical needs." (*Estelle*, at p. 104.) "Deliberate indifference" is established where the challenged deficiency is "sufficiently serious," and prison officials "know[] that inmates face a substantial risk of serious harm and disregard that risk by failing to take reasonable measures to abate it." (*Farmer, supra,* 511 U.S. at p. 847.) Prison officials may not be "deliberately indifferent to the exposure of inmates to a serious communicable disease" (*Helling v. McKinney* (1993) 509 U.S. 25, 33), and the placement of inmates in places to which infectious diseases could

18

easily spread constitutes a constitutional violation.  (*Hutto v. Finney, supra,* 437 U.S. at p. 682.)  Deliberate indifference may be proven by circumstantial evidence and it may be inferred from "the very fact that the risk was obvious." (*Farmer,* at p. 842.)

It is doubtful any correctional agency in the United States is as familiar with the adverse consequences of mass incarceration on inmates' medical care, and the need to prevent them, as CDCR is or should be, given its litigation of the issue in the *Plata* and *Coleman* cases since the turn of the century. Respondents concede the point and agree that responsible prison officials were "subjectively aware" of the risk COVID-19 presents to "inmate health or safety."  (*Farmer, supra,* 511 U.S. at pp. 837, 839, 847.)

Respondents' position is that the measures CDCR employed to respond to the risk posed by COVID-19 were reasonable.  The Attorney General describes those measures as follows:  establishment of a "unified command center to coordinate custody and medical responses to COVID-19" and an "ambulance strike team . . . to facilitate the rapid transfer of patients to outside healthcare settings if needed"; installation of  "a large air-conditioned tent structure with a capacity to treat 164 patients"; repurposing of an "on-ground chapel to house incarcerated persons who are positive with COVID-19 but are asymptomatic"; repurposing of "an on-site California Prison Industry Authority furniture facility into an alternative care site to treat up to 110 COVID-positive patients who are symptomatic," as well 140 "positive COVID-19 patients who are asymptomatic who are receiving health care screenings to immediately identify anyone with new or worsening symptoms"; hiring of an "outside vendor to deep clean the prison's interior spaces," provision to all inmates and staff of N95 masks that must be worn on prison grounds; distribution to inmates and staff of "tens of thousands of pieces of Personal

Protective Equipment"; and weekly testing of inmates who previously tested negative. Further, respondents say, CDCR has expedited release plans for inmates statewide to combat the effects of the COVID-19 pandemic by increasing the physical distancing between those in prison," and San Quentin's population was reduced by 942 inmates between March and August 21, 2020, "in part because of the release plans." Finally, respondents maintain that San Quentin's precautionary measures have resulted in COVID-19 cases at San Quentin dropping to only 37 as of August 21, 2020, with 2,121 cases having resolved, and petitioner having fully recovered.[14]

As to the last of these points, respondents have offered no evidence to support their assertion that the decrease in number of active COVID-19 cases at San Quentin is the result of CDCR's precautionary measures rather than the natural consequence of three quarters of the prison population being infected with the virus. Contrary to respondents' assumption, according to the declaration of Dr. Beyrer, "[h]ad San Quentin done nothing, the rates of infection there would have been roughly the same." Further, according to Dr. Beyrer, "this disaster is not over yet. *A 75% infection rate indicates that a substantial portion of the population could still get COVID-19, become seriously ill or die. At present, San Quentin remains unsafe for inmates, staff, and others coming into the facility."* Respondents have offered no evidence to refute Dr. Beyrer's statement. Nor have respondents challenged with evidence Dr. Chin-Hong's declaration that "immunity is likely short lived, setting the stage for reinfection," or the observations of the authors of the Urgent Memo, in a different report, that some "people who have recovered from COVID-19 are

---

[14] According to the CDCR Web site, as of October 16, there was one active case at San Quentin, with 2,152 cases resolved. (CDCR, Population COVID-19 Tracking <https://www.cdcr.ca.gov/covid19/population-status-tracking/> (as of Oct. 16, 2020).

testing positive again" and "[r]esolved cases may not have protective immunity."[15]

Respondents' contention that the measures they have taken constitute a reasonable response to the risk posed by COVID-19 misconstrues the petition. Petitioner and the scientists he relies upon do not say the measures respondents took to combat the outbreak of COVID-19 at San Quentin are unreasonable *in and of themselves*, but only because they are unaccompanied by a dramatic reduction of the prison population, which is a sine qua non of *any* reasonable remedial effort. The target of the petition is not what respondents have done but what they refuse to do. None of the commendable steps respondents have taken to contain the spread of COVID-19 will be effectual, petitioner and his experts maintain, unless considerable room is made for inmates to physically distance themselves from one another effectively because, in the absence of a vaccine, physical distancing is now by far the most effective way of limiting transmission of COVID-19.

The Attorney General's return alleges that the reasonable efforts respondents have taken, have reduced the inmate population of San Quentin to slightly more than full capacity (100.9%), with 3,109 inmates as of August 19, 2020. Petitioner concedes that if there were no need for inmates to physically distance themselves from one another, 100 percent of capacity might not be cause for alarm. However, the population of San Quentin was at or near that level when the Urgent Memo was written in June 2020—3,547 inmates, according to the Urgent Memo. The scientists who wrote the Urgent Memo were working closely with CDCR doctors and aware of the measures CDCR

---

[15] AMEND/Berkeley Public Health, Cameron et al., *Evaluation of the April-May 2020 COVID-19 Outbreak at California Men's Colony* (July 20, 2020) p. 16. <https://amend.us/wp-content/uploads/2020/07/CMC_Report_20200720.pdf> (as of Oct. 16, 2020).

was employing.  They found these measures inadequate because physical distancing was crucial, the space needed to do it effectively did not exist, and CDCR was doing little to find the necessary space—which could not be accomplished without quickly reducing the prison population drastically.  The Attorney General fails to explain, and we cannot fathom, how the measures he relies upon will significantly facilitate physical distancing any time soon.  To the contrary, respondents in effect maintain that prompt physical distancing is unnecessary—a position at odds with the Urgent Memo and other expert opinion, and unsupported by any evidence respondents have offered.

The Urgent Memo states, and the Attorney General does not provide conflicting factual allegations or evidence, that more than half of the 800 inmates who live in the north and west blocks, which have cells with open-grills and poor ventilation, have at least one COVID-19 risk factor, and an alarming 300 have four or more such risk factors, so that an outbreak in those housing units "could easily flood—and overwhelm—San Quentin as well as Bay Area hospitals."  The statement in the Urgent Memo that a 50 percent reduction of the population "will allow every cell in North and West Blocks to be single-room occupancy"  indicates that the current reduction of the prison population to about 100 percent of capacity required double-celling, which itself necessarily prevents physical distancing.

The Urgent Memo also points out, and again it is factually undisputed, that approximately "500 inmates are currently living in the Reception Center,"[16] and that the gymnasium has been converted into a dormitory with

---

[16] According to the CDCR Web site, the official purpose of the "Reception Center is [or was] to safely and securely house and process incoming inmates by: compiling and evaluating the inmates' criminal records, life histories, medical, dental, physiological and mental health histories, and social histories, and determining the inmates' custody score, identify any specific placement

"little to no ventilation," "creating high risk for a catastrophic super spreader event." The Urgent Memo states, in bolded and underlined print, that **[t]his unit should be prioritized for closure as a dorm, once sufficient population reduction has been achieved through release.**" Dormitories provide congregate living space, which is inimical to physical distancing.

CDCR has taken some steps that are directly designed to reduce the size of the statewide prison population and thereby maximize space to engage in physical distancing. Under one expedited release plan, inmates who are within 180 days of their release date are released on a rolling basis. Under a second such plan, inmates with 365 days or less remaining on their sentence who reside in specified institutions housing large populations of high risk prisoners, including San Quentin, may be released a year earlier than specified by their sentences. A third plan allows release on a case by case basis for inmates who are "deemed high risk for COVID-19 complications" by California Correctional Health Care Services, are not serving sentences of life without possibility of parole or condemned to death, have an assessment indicating a low risk of violence and are not high-risk sex offenders.[17]

A severe limit CDCR has placed on the type of inmates eligible for release under the first two of these plans renders it unlikely they will result in substantial population reduction at San Quentin: Neither plan applies to inmates currently serving time for "a violent crime as defined by law." This

---

needs, and assigning them to one of the 34 State prisons." (CDCR, Reception Center and Camps (Males) <https://www.cdcr.ca.gov/adult-operations/reception-center/#:~:text=The%20Reception%20Center%20mission%20is,histories%2C%20and%20social%20histories%2C%20and> [as of Oct. 16, 2020].)

[17] CDCR, Expedited Releases <https://www.cdcr.ca.gov/covid19/expedited-releases/> (as of Sept. 30, 2020).

limitation excludes from the plans virtually all life prisoners eligible for parole (lifers). At oral argument counsel for respondents represented that no life prisoner eligible for parole had been released from San Quentin or any other prison in order to maximize the space available for physical distancing. The expedited release plans also exclude most inmates convicted of second or third strikes. (§§ 667, 1170.12.)

These exclusions apply to a large proportion of San Quentin's inmate population. In May of 2019, the 1,254 lifers confined in San Quentin comprised approximately 30 percent of the total population of the prison.[18] The CDCR Web site does not provide statistics revealing the number of second and third strikers currently housed in San Quentin, but the statistics it does provide show that at the end of 2018, there were 33,415 second strikers and 6,901 third strikers in statewide custody, together comprising approximately 31 percent of the statewide prison population (127,709).[19] Considering these numbers, together with the number of inmates who are expressly ineligible for release by the terms of their sentences (those sentenced to death (695) or to life

[18] CDCR, COMPSTAT DAI Statistical Report – 13 Month (July 11, 2019) pp. 245, 248 <https://www.cdcr.ca.gov/research/wp-content/uploads/sites/174/2019/10/2019_05_DAI-Reception-Centers.pdf?label=Reception%20Centers&from=https://www.cdcr.ca.gov/research/compstat/> (as of Oct. 16, 2020).

[19] CDCR, Division of Correctional Policy Research and Internal Oversight, Offender Data Points: Offender Demographics for the 24-Month Period Ending December 2018 (2018), table 1:10: In-Custody Population by Sentence Type, p. 10 <https://www.cdcr.ca.gov/research/wp-content/uploads/sites/174/2020/01/201812_DataPoints.pdf>; Public Policy Institute of California, *Just the Facts: California's Prison Population* (July 2019) p. 3 <https://www.ppic.org/publication/californias-prison-population/> (as of Oct. 16, 2020).

imprisonment without possibility of parole (11)),[20] it would appear unlikely if not impossible for the San Quentin inmate population to be reduced by 50 percent without transferring or releasing some serving sentences for violent offenses.

The third expedited release program, for medically high-risk inmates, does not exclude inmates serving time for violent offenses if their sentences make them eligible for parole, but does require a low-risk assessment for eligibility. It also requires consideration of each individual case, which necessarily makes it a comparatively time-consuming process.

The expedited release programs, while laudable as a means to reduce overcrowding in the prison system, generally fail to address the degree of reduction necessary to allow sufficient physical distancing at San Quentin in light of the challenges imposed by its uniquely antiquated physical plant, or the urgency of the need to implement such reduction in the midst of the COVID-19 pandemic. We accept the 50 percent figure the Urgent Memo described as the minimum necessary because, as we have said, the Attorney General has not offered any evidence to dispute the need for this minimum degree of reduction in order to allow the necessary space for physical distancing of the remaining prison population.

Moreover, the Attorney General's dismissal of the Urgent Memo's call for a 50 percent population reduction because the authors are medical doctors concerned about patient health and not "public safety experts who factor in public safety concerns or the need to proceed with caution before releasing

---

[20] CDCR, COMPSTAT DAI Statistical Report – 13 Month, *supra,* at p. 248 <https://www.cdcr.ca.gov/research/wp-content/uploads/sites/174/2019/10/2019_05_DAI-Reception-Centers.pdf?label=Reception%20Centers&from=https://www.cdcr.ca.gov/research/compstat/> (as of Oct. 16, 2020).

inmates" is based on a false dichotomy. While the Urgent Memo refers to reducing the population at San Quentin "via decarceration" (Urgent Memo, *supra,* at p. 3), release of prisoners is not the only avenue open to CDCR; the population at San Quentin could also be rapidly reduced by transferring uninfected prisoners to other CDCR supervised facilities. The total population of San Quentin is small by comparison to the statewide prison system as a whole: According to the data available on CDCR's Web site, the total in-custody population as of September 30, 2020, was 98,144,[21] while the total population at San Quentin was 3,462.[22] With no releases at all, transferring 50 percent of the inmates out of San Quentin would require the system to absorb some 1731 prisoners. CDCR data indicates that as of September 30, 11 male facilities (excluding San Quentin) were below capacity, to varying degrees.[23] We do not mean to suggest any San Quentin prisoner could easily be transferred to any other facility with space: As CDCR has presumably learned from its mistake in transferring infected prisoners from CIM to San Quentin, COVID-19 adds further complexity to the many individual and institutional factors bearing on the appropriateness of such interinstitutional transfers. Rather, the point is that the Attorney General's return appears to

---

[21] CDCR, Weekly Report of Population, September 30, 2020, Total CDCR Population <https://www.cdcr.ca.gov/research/wp-content/uploads/sites/174/2020/10/Tpop1d200930.pdf> (as of Oct. 16, 2020).

[22] CDCR, Reports and Statistics for San Quentin Prison, Statistical Reports (SB601), Latest Quarterly Report <https://www.cdcr.ca.gov/research/reports-and-statistics-sq/> (as of Oct. 16, 2020).

[23] CDCR, Division of Correctional Policy Research and Internal Oversight, Office of Research, Weekly Report of Population, Weekly Institution Population Detail (Sept. 30, 2020) p. 2 <https://www.cdcr.ca.gov/research/wp-content/uploads/sites/174/2020/10/Tpop1d200930.pdf> (as of Oct. 16, 2020).

give no consideration to the option of reducing the population at San Quentin through transfers—posing no danger to the public—rather than through releases.

But even focusing on releases, the two expedited release programs aimed at prisoners near the end of their sentences, by excluding any inmate serving time for a violent offense, necessarily exclude from consideration many San Quentin inmates who are unlikely to present a danger to the public despite their past offenses (and at the same time, are likely to be at high risk for COVID-19). Life prisoners eligible for parole, such as petitioner, are an increasingly large percentage of the total prison population. As a result of the Criminal Justice Realignment Act of 2011 (Realignment Act) and Proposition 47,[24] which significantly reduced the number of non-violent offenders in state prison, the percentage of violent offenders has grown correspondingly. As just noted, in May of 2019, lifers were 30 percent of the total inmate population at San Quentin,[25] and the percentage may now be higher since CDCR began

---

[24] The Realignment Act changed the punishment for certain felony convictions such that "low-level felony offenders who have neither current nor prior convictions for serious or violent offenses, who are not required to register as sex offenders and who are not subject to an enhancement for multiple felonies involving fraud or embezzlement, no longer serve their sentences in state prison" but instead "serve their sentences either entirely in county jail or partly in county jail and partly under the mandatory supervision of the county probation officer. (Pen. Code, § 1170, subd. (h)(2), (3), (5).)" (*People v. Scott* (2014) 58 Cal.4th 1415, 1418–1419.)

Proposition 47, approved by the voters in 2014, "reduces many common theft- and drug-related offenses from felonies to misdemeanors for offenders who do not have prior convictions for specified violent or serious offenses." (*People v. Dehoyos* (2018) 4 Cal.5th 594, 597.)

[25] As of December 31, 2018, the statewide population of such lifers was 27,328, which was only 21.4 percent of the total prison population. (Division of Correctional Policy Research and Internal Oversight, CDCR: Offender

expediting the release of non-lifers.  Given the length of their minimum sentences, lifers are much older than non-violent offenders at the time they become eligible for parole and receive a release date.  Most have by then "aged out" of criminal behavior and present less of a threat to public safety. (*Coleman v. Brown* (E.D. Cal. 2013) 922 F.Supp.2d 1004, 1051, fn. 47; Weisberg et al., Stanford Criminal Justice Center, Life in Limbo:  An Examination of Parole Release for Prisoners Serving Life Sentences with the Possibility of Parole in California (Sept. 2011) pp. 16–17 (Stanford Study).) Finally, due to their advanced age, lifers are also more in need of medical attention than other inmates and at much greater risk from COVID-19; according to Dr. Chin-Hong, patients over the age of 50 "generally fare worse than their younger counterparts when infected with COVID-19" and the situation is "worse with every decade above 50."  This age-related decreased risk of danger to the public and greater vulnerability to COVID-19 also applies to other older inmates who have already served lengthy prison terms, such as some third strikers and second strikers, many of whom are also necessarily excluded from the CDCR's expedited release programs because they are serving sentences for violent offenses.

The high percentage of lifers eligible for parole in the San Quentin population suggests the complete exclusion of these inmates from two of CDCR's three expedited release programs is likely to impede achievement of the population reduction necessary to combat the spread of COVID-19, and the problem is yet more obvious if elderly second and third strikers are considered.

---

Demographics for the 24-Month Period Ending December 2018 (2018), table 1:10:  In-Custody Population by Sentence Type, p. 10 <https://www.cdcr.ca.gov/research/wp-content/uploads/sites/174/2020/01/201812_DataPoints.pdf> [as of Oct. 16, 2020].)

Exclusion of lifers and other older prisoners who have committed violent offenses and served lengthy prison terms is also difficult to defend, given their low risk for future violence and high risk of infection and serious illness from the virus.

CDCR and the Board of Parole, however, have historically been unwilling to release elderly life prisoners eligible for parole—which has been a cause of concern to the federal courts and to the California Legislature. Release of elderly, low-risk prisoners such as lifers was one of the untapped options for reducing prison overcrowding expressly discussed by the three-judge court in the *Plata* litigation in its 2013 decision denying the state's request to vacate the order requiring reduction of the prison population to 137.5 percent of design capacity. (*Coleman v. Brown, supra,* 922 F.Supp.2d at p 1051.) In a section of the opinion addressing the defendants' lack of compliance with the population reduction order, the court discussed measures it had previously determined "could be taken without adversely impacting public safety," including release of "elderly low-risk prisoners" such as life prisoners eligible for parole. (*Coleman,* at p. 1051.) Citing the Stanford Study*, supra,* at pages 16 and 17, the court noted, "it appears that 75% of [elderly] Lifers have been placed in CDCR's lowest risk category, and the historical recidivism rate of Lifers is approximately 1%—in comparison to California's overall recidivism rate of 48%." (*Id.* at p. 1051, fn. 47.) In another decision, the three-judge court quoted the Stanford Study's description of the recidivism rate for lifers as "miniscule." (*Coleman v. Brown* (E.D.Cal. 2013) 960 F.Supp.2d 1057, 1067, quoting Stanford Study, at p. 3.)[26]

---

[26] The study found that "among the 860 murderers paroled by the Board since 1995, only *five* individuals have returned to jail or returned to [prison] for new felonies since being released, and none of them recidivated for life-term crimes." (Stanford Study, *supra*, at p. 17.)

In 2014, when the three-judge court granted a two-year extension of time (to Feb. 2016) for reduction of the prison population to 137.5 percent, its order included requiring the defendants to "[f]inalize and implement a new parole process whereby inmates who are 60 years of age or older and have served a minimum of twenty-five years of their sentence will be referred to the Board of Parole Hearings to determine suitability for parole."

Taking its cue from the federal courts, the California Legislature agreed that elderly life prisoners should receive heightened consideration for release because of their decreased risk of dangerousness, despite their past violent offenses, by enacting the Elderly Release Program (§ 3055) in 2017. Pursuant to section 3055, "[w]hen considering the release of any inmate who is 60 years of age or older and has served a minimum of 25 years of continuous incarceration on his or her current sentence, serving either a determinate or indeterminate sentence," the parole board "shall give special consideration to whether age, time served, and diminished physical condition, if any, have reduced the elderly inmate's risk for future violence." (§ 3055, subds. (a), (c).)[27]

The strong correlation between age and crime is one of the most tested and established in the field of criminology. (See, e.g., the seminal study in Sampson & Laub, *Life-Course Desister? Trajectories of Crime Among Delinquent Boys Followed to Age 70* (2003) 41 Criminology 555.) CDCR's

[27] The Elderly Parole Program does not appear to have had much practical influence on the parole process. According to the Board of Parole Hearings, 68 percent of parole hearings held in 2019 for indeterminately sentenced life-prisoners eligible for an elderly parole hearing resulted in a denial, and 73 percent of hearings for determinately sentenced inmates were denied. (Board of Parole Hearings, 2019 Report of Significant Events (Feb. 18, 2020) p. 7 <https://www.cdcr.ca.gov/bph/wp-content/uploads/sites/161/2020/02/BPH-Significant-Events-2019.pdf?label=2019%20Report> [as of Oct. 16, 2020].)

refusal to consider any offenders who have committed violent offenses for expedited release as part of its COVID-19 response is at odds with judicial, legislative and academic recognition of this correlation.

In a life-threatening emergency like that posed by COVID-19 in San Quentin, respondents have the power to remove *all persons incarcerated at San Quentin*, not just inmates convicted only of nonviolent offenses. Pursuant to Government Code section 8658, "[i]n any case in which an emergency endangering the lives of inmates of a state . . . correctional institution has occurred or is imminent, the person in charge of the institution may remove the inmates from the institution. He shall, if possible, remove them to a safe and convenient place and there confine them as long as may be necessary to avoid the danger, or, if that is not possible, may release them. Such person shall not be held liable, civilly or criminally, for acts performed pursuant to this section." The removal section 8658 permits includes not just release from prison but also transfer to other correctional institutions and detention facilities.

Respondents thus have authority to include all elderly inmates eligible for parole in the expedited release plans it has developed in response to the COVID-19 crisis, but have chosen not to do so despite such inmates' heightened vulnerability to the virus and reduced risk of dangerousness to the public. As earlier noted, statistics available on CDCR's Web site render it doubtful whether a 50 percent reduction in San Quentin's population could soon take place without releasing or transferring any inmates who have committed violent offenses.

As to whether respondents' failure to implement the 50 percent population reduction that would allow effective physical distancing among those remaining constitutes the "deliberate indifference" petitioner is required

31

to establish, the most salient opinion of the United States Supreme Court is *Farmer, supra,* 511 U.S. 825. In that case, a transsexual prisoner claimed prison officials showed "deliberate indifference" by placing him in the general prison population, thus failing to keep him from harm allegedly inflicted by other prisoners. After the United States Court of Appeals affirmed the district ruling in favor of prison officials, the Supreme Court vacated the ruling.

Under the test adopted in *Farmer*, "an Eighth Amendment claimant need not show a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm. [Citations.] We doubt that a subjective approach will present prison officials with any serious motivation 'to take refuge in the zone between "ignorance of obvious risks" and "actual knowledge of risks." ' [Citation.] Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, [citation], and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious. [Citation.] For example, if an Eighth Amendment plaintiff presents evidence showing that a substantial risk of inmate attacks was 'longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus "must have known" about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk.' [Citation.]" (*Farmer, supra*, 511 U.S. at pp. 842–843.)

In the present case respondents concede "actual knowledge" of the "substantial risk of serious harm" to San Quentin inmates and accept their

32

duty to alleviate their "serious medical needs." There is therefore no dispute as to those facts.

*Farmer* goes on to declare that "[a]n inmate seeking an injunction on the ground that there is 'a contemporary violation of a nature likely to continue,' [citation] must adequately plead such a violation; to survive summary judgment, he must come forward with evidence from which it can be inferred that the defendant-officials were at the time suit was filed, and are at the time of summary judgment, knowingly and unreasonably disregarding an objectively intolerable risk of harm, and that they will continue to do so; and finally to establish eligibility for an injunction, the inmate must demonstrate the continuance of that disregard during the remainder of the litigation and into the future. In so doing, the inmate may rely, in the district court's discretion, on developments that postdate the pleadings and pretrial motions, as the defendants may rely on such developments to establish that the inmate is not entitled to an injunction. [Citations.] If the court finds the Eighth Amendment's subjective and objective requirements satisfied, it may grant appropriate injunctive relief." (*Farmer, supra,* 511 U.S. at pp. 845–846.)

That respondents are presently disregarding the risk of harm and will continue to do so is also not disputed by any evidence the Attorney General has provided. As we have said, petitioner produced evidence that the efforts respondents have taken to control COVID-19 in San Quentin are insufficient to protect inmates from COVID-19 without the speedy reduction of the population of that prison by at least half. Respondents disagree with that claim, but have provided no evidence at all contradicting the substantial evidence petitioner has marshalled. Respondents thus disregard uncontested evidence that the measures CDCR has taken to protect San Quentin will be ineffectual if prison officials do not immediately reduce the population of San Quentin

33

dramatically. The recommended 50 percent reduction has not taken place and respondents have not suggested they have plans to meet that goal; instead, as we have said, they have taken the position that such an extreme reduction is unnecessary.

We agree with petitioner that respondents' failure to accompany the measures they are taking with a drastic reduction of the prison population is not reasonable. The total population of San Quentin reported in the Urgent Memo, 3547 (Urgent Memo, *supra*, at p. 3), indicates the prison was at slightly over 100 percent (100.15) of its design capacity in June 2020. Even so, as the Urgent Memo states and the Attorney General does not deny, 500 of those inmates were living in the Reception Center, the gymnasium had been converted into a dormitory with "little or no ventilation," and many prisoners, like petitioner at the time he commenced this writ proceeding, were living with cellmates in cells that are 4 or 5 feet by 8 or 9 feet. Reduction of the inmate population by 50 percent is what the experts deemed necessary to alleviate these living conditions. According to the return, San Quentin was at 100.9 percent capacity, with 3,109 inmates, as of August 19, 2020. As of September 30, it was at 95.1 percent capacity, with 2,930 inmates.[28] Clearly, respondents' efforts thus far have not come close to creating the physical space experts have concluded is required for effective physical distancing to control the spread of COVID-19.

At a prison with "exceedingly poor ventilation, extraordinarily close living quarters, and inadequate sanitation" due to its uniquely antiquated infrastructure, in which 75 percent of the population has been infected with

---

[28] CDCR, Division of Correctional Policy Research and Internal Oversight, Office of Research, Weekly Report of Population (Sept. 30, 2020) p. 2 <https://www.cdcr.ca.gov/research/wp-content/uploads/sites/174/2020/10/Tpop1d200930.pdf> (as of Oct. 16, 2020).

COVID-19, and 28 infected inmates have recently died, the continued use of double cells and congregate living spaces is not merely negligent, it is reckless. The recklessness is aggravated by respondents' refusal to consider the expedited release, or transfer, of prisoners who are serving time for violent offenses but have aged out of a propensity for violence (life prisoners eligible for parole and older second and third strikers)—a large and still growing class of San Quentin prisoners who are more vulnerable to COVID-19 and less likely to recidivate than the prisoners whose expedited release CDCR facilitates. CDCR has taken many commendable steps toward reducing the impact of COVID-19 in its facilities, but it has dismissed the fundamental prerequisite to avoidance of another disaster at San Quentin: prompt reduction of the inmate population to the level necessary to allow effective physical distancing for those remaining.

As the Supreme Court declared in *Farmer*, "acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk. (*Farmer, supra,* 511 U.S. at p. 836.)

Here, respondents have shown deliberate indifference to the risk of substantial harm to petitioner, a life prisoner whose age makes him vulnerable to COVID-19 even aside from preexisting health conditions, and who also suffers from respiratory problems due to bullet fragments lodged in his left lung. In the face of this pandemic, which appears to take its greatest toll among older individuals and in congregate living situations, and in an aged facility with all the ventilation, space, and sanitation problems referenced in the Urgent Memo, respondents' failure to immediately adopt and implement measures designed to eliminate double celling, dormitory style housing and other measures to permit physical distancing between inmates is morally

indefensible and constitutionally untenable. "Prisoners retain the essence of human dignity inherent in all persons. Respect for that dignity animates the Eighth Amendment prohibition against cruel and unusual punishment. ' "The basic concept underlying the Eighth Amendment is nothing less than the dignity of man." ' " (*Brown v. Plata, supra,* 563 U.S. at p. 510, quoting *Atkins v. Virginia* (2002) 536 U.S. 304, 311.) "A prison that deprives prisoners of basic sustenance, including adequate medical care, is incompatible with the concept of human dignity and has no place in civilized society." (*Brown*, at pp. 510–511.)

This constitutional violation can be immediately remedied only by removing petitioner from San Quentin, whether by release or by transfer to another facility where physical distancing is possible. After petitioner's March 20, 2019 parole suitability hearing resulted in a three-year denial, the Board exercised its discretion to advance petitioner's next suitability hearing date—an action it could take only upon a determination that "a change in circumstances or new information establishes a reasonable likelihood that consideration of the public and victim's safety does not require the additional period of incarceration." (§ 3041.5, subd. (b)(4).) On October 16, 2020, a Board panel granted petitioner release on parole. This decision does not moot the issues herein, as it will not result in petitioner's immediate release from San Quentin: The panel's decision is subject to review by the Board for 120 days (Pen. Code, § 3041, subd. (b)(2); Cal. Code Regs., tit. 15, § 2041, subd. (h)), and is then subject to review by the Governor for an additional 30 days (Cal. Const., art. V, § 8; Pen. Code, § 3041.2.) The need remains for petitioner to be immediately removed from San Quentin, by transfer to a CDCR facility that is able to provide the necessary physical distancing and other measures to protect against COVID-19 or to another placement meeting these criteria, and we so order. It is our hope

that the Board and the Governor will expedite their reviews of the panel's decision granting petitioner release on parole.

## B.

### *The Remedy We Provide Will Benefit All San Quentin Inmates and Provide CDCR Latitude to Determine How That Happens*

The supplemental petition asks us to "grant declaratory relief requiring the release of all San Quentin inmates whose age or health condition put them at enhanced risk of death or grave illness from exposure to COVID-19." As petitioner states, "[n]umerous other San Quentin inmates also face an intolerable risk from exposure to the virus under the current conditions of their confinement due either to their age or underlying medical conditions which heighten their vulnerability to the disease," including not only respiratory conditions but also "cardiovascular conditions such as coronary artery disease, diabetes, and chronic kidney disease, among others." Petitioner contends that "[h]abeas corpus is an appropriate vehicle to 'present[] issues related to the conditions of confinement in a state prison' and to vindicate 'the rights of prison inmates generally' " (citing *In re Head* (1986) 42 Cal.3d 223, 226), and there is "ample authority to mandate such broad systemic relief in order to redress this massive ongoing infringement of the most vulnerable San Quentin inmates' constitutional rights to freedom from their current life-threatening confinement conditions," quoting *In re Loveton* (2016) 244 Cal.App.4th 1025, 1046 (*Loveton*).

We agree that CDCR's deliberate indifference to the risk of substantial harm to petitioner necessarily extends to other similarly situated San Quentin inmates. We also agree that a "habeas corpus petition is an acceptable vehicle for a general declaration of the procedural rights of individuals detained" under challenged procedures (*In re Walters* (1975) 15 Cal.3d 738, 744, fn. 3;

37

accord, *Faucette v. Dunbar* (1967) 253 Cal.App.2d 338, 343), but we think it would be inappropriate and unwise to order the release of prisoners we considered vulnerable even if we thought we had the power to do so in this proceeding.

First, we think the determination of vulnerability is far more fraught than petitioner imagines. The parties strongly disagree about the age at which vulnerability becomes cognizable by correctional authorities, as well as the degree of vulnerability to COVID-19 attributable to particular medical conditions. Indeed, the parties contest the vulnerability of petitioner himself. Not only must the level of vulnerability that would qualify an inmate for special treatment by correctional authorities be determined on the basis of scientific facts, not law, but attempting to decide the question would require us to ignore the admonition that courts should not become "enmeshed in the minutiae of prison operations." (*Bell v Wolfish* (1979) 441 U.S. 520, 562.)

Second, we question whether *In re Head, supra,* 42 Cal.3d 223, *In re Walters, supra*, 15 Cal.App.3d 738, and other cases authorizing the release from detention of a petitioner who sought and received habeas relief also authorize the release of similarly situated prisoners who did not file a habeas corpus petition. In *Loveton*, *supra*, 244 Cal.App.4th at page 1045, we noted, after a "Cf." designation, the court's statement in *Brown v. Plata, supra*, 563 U.S. 493, "in [the] prison administration context, that courts 'must not shrink from their obligation to "enforce the constitutional rights of all 'persons,' including prisoners." [Citation.] Courts may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration.' " But *Brown* was not a habeas corpus proceeding, and *Loveton*, which was, did not involve release of convicted

38

prisoners serving their sentences.[29]  Petitioner has presented us with no habeas corpus case in which the court actually ordered the release of inmates of a prison or other detention facility on the ground they were similarly situated to the prisoner who sought and obtained release.

Third, release of inmates similarly situated to petitioner is not the only means by which respondents can cure the existing constitutional violation, or even necessarily the most expeditious way to do so.  As we have been at pains to emphasize, the immediate need is for a reduction of the San Quentin inmate population that will allow sufficient physical distancing among the inmates who remain.  This might be accomplished by releasing or transferring the most vulnerable inmates, but it might also be accomplished by releasing or transferring other inmates so as to create the space necessary to protect the vulnerable at San Quentin.  With lives at stake, it is vital to proceed with all possible speed, and respondents are best positioned to determine the inmates whose removal from San Quentin can be processed most expeditiously.

Nevertheless, we are not without means to expedite the release or transfer from San Quentin of more inmates than are now deemed eligible for release.  Section 1484 provides that in a habeas corpus proceeding, if the court finds that imprisonment of a prisoner is unlawful, or he or she is entitled to discharge, "[t]he court or judge must thereupon proceed in a summary way to hear such proof as may be produced against such imprisonment or detention, or in favor of the same, *and to dispose of such party as the justice of the case may require . . .* and have full power and authority . . . *to do and perform all other acts and things necessary to a full hearing and determination of the case.*"

---

[29] The issue in *Loveton* was the timing for statutorily required transfer of mentally incompetent defendants from jail to treatment facilities.  (*Loveton, supra,* 244 Cal.App.4th at p. 1028.)

(§ 1484, italics added.)  In *In re Crow* (1971) 4 Cal.3d 613, a unanimous opinion by Justice Tobriner, our Supreme Court treated section 1484 as acknowledging that "[i]nherent in the power to issue the writ of habeas corpus is the power to fashion a remedy for the deprivation of any fundamental right which is cognizable in habeas corpus." (*Crow*, at p. 619, fn. 7.)  "[T]he court's power could not be limited to either discharging the petitioner from, or remanding him to, custody [citations], but extended to disposing of him 'as the justice of the case may require[.]' " (*Id.* at p. 619; accord, *People v. Booth* (2016) 3 Cal.App.5th 1284, 1312.)  The Penal Code thus contemplates that a court, faced with a meritorious petition for a writ of habeas corpus, should consider factors of justice and equity when crafting an appropriate remedy.  (*In re Harris* (1993) 5 Cal.4th 813, 851.)  The United States Supreme Court expressed the same view in *Harris v. Nelson* (1969) 394 U.S. 286, 290:  "The scope and flexibility of the writ—its capacity to reach all manner of illegal detention—its ability to cut through barriers of form and procedural mazes— have always been emphasized and jealously guarded by courts and lawmakers. The very nature of the writ demands that it be administered with the initiative and flexibility essential to insure that miscarriages of justice within its reach are surfaced and corrected."

The manner in which the writ of habeas corpus has been employed to enhance the rights of prisoners similarly situated to the petitioner is illustrated by *In re Rodriguez* (1975) 14 Cal.3d 639.  In that case, the Supreme Court issued a writ of habeas corpus directing the release of the petitioner, who had established a constitutional violation with respect to his term of imprisonment.  (*Id.* at p. 656.)  The court then went on to describe the procedure necessary to avoid the same constitutional violation in other cases,

and ordered the parole board to follow that procedure in the future. (*Id*. at pp. 651–653, 654, fn. 18.)

The Eighth Amendment violation currently existing due to insufficient space for the necessary physical distancing will continue unless and until the population at San Quentin can be reduced to the 50 percent level. Unless CDCR's existing expedited release programs are sufficient to promptly achieve this population reduction—which, as we have said, the sheer numbers indicate they cannot be—respondents will have to find additional means of releasing or transferring prisoners out of San Quentin. This could involve expanding eligibility for the two expedited release programs currently limited to inmates not serving sentences for violent offenses to inmates like petitioner, who are over age 60 and have completed minimum terms of at least 25 years. As we have said, such inmates as a group pose little risk of danger to the public, and respondents would be free to employ such safety screening procedures as they deem appropriate to guard against the risk of danger that might be posed by individual inmates. But we do not dictate this or any other specific requirement for releasing prisoners. We recognize that determination of the most expeditious means of reducing the inmate population will depend on a number of factors, including consideration of the number and vulnerability of inmates who are not eligible for parole or cannot safely be transferred to another facility. Respondents are free to employ the means they determine will most quickly achieve the necessary population reduction.

To be clear: We do not order the *release* of petitioner or any other inmate. We order respondents to remove petitioner from San Quentin as described, and to immediately commence the design and implementation of plans to expedite release or transfer of the number of inmates necessary to reduce San Quentin's population to 50 percent of its June 2020 population,

41

which was the population upon which Urgent Memo based its conclusion as to the reduction required for adequate physical distancing. The objective is simply to make conditions as safe as reasonably possible for those who remain incarcerated at this facility.

## III.

## DISPOSITION

The writ is granted.

Petitioner shall immediately be removed from San Quentin State Prison by transfer to a CDCR facility that is able to provide the necessary physical distancing and other measures to protect against COVID-19, or to another placement meeting these criteria.[30]

Respondents are also ordered to expedite the removal from San Quentin State Prison—by means of release on parole or transfer to another correctional facility administered or monitored by CDCR—of the number of prisoners necessary to reduce the population of that prison to no more than 1,775 inmates. If necessary to achieve this reduction, respondents are ordered to revise their expedited release programs to include inmates over age 60, who have served at least 25 years of their sentences and are eligible for parole, such as life prisoners eligible for parole and second or third strike prisoners, even if such prisoners are serving a sentence for a violent offense. Respondents shall ensure that inmates fitting the specifications of the Elderly Parole Program receive the "special consideration" for release prescribed by that program (§ 3055).

---

[30] In accordance with our August 14, 2020, order, respondents placed petitioner in a single cell in a quarantined area of San Quentin. This solution, however, does nothing to advance the population reduction necessary to protect the inmate population at San Quentin.

42

Given the gravity of the emergency at San Quentin, the speed at which transmission of the coronavirus may take place in its outdated facilities, and the ease with which it appears respondents can modify their existing policies and programs to expedite releases and transfers in accordance with the views we have expressed, this decision shall be final in this court 15 days from the date it is filed.  (Cal. Rules of Court, rule 8.387(b)(3)(A).)

Any dispute that may arise regarding application of our opinion shall be brought to the Marin County Superior Court.

_____
Kline, P.J.

We concur:


_____
Richman, J.


_____
Stewart, J.

*In re Von Staich, on Habeas Corpus* (A160122)

| | |
|---|---|
| Trial Court: | Marin County Superior Court |
| Trial Judge: | Hon. Paul M. Haakenson |

Attorneys for Appellant:
By Appointment of the Court of Appeal
First District Appellate Project
Jonathan Soglin
Executive Director

J. Bradley O'Connell
Assistant Director

L. Richard Braucher

Attorneys for Amici Curiae
on behalf of Appellant:
American Civil Liberties Union of Northern America
Criminal Justice Scholars
Hadar Aviram

Office of the State Public Defender
Mary K. McComb
Alexander Post
Alyssa Mellott

San Quentin State Prison Law Office
Donald H. Specter

Attorneys for Respondents:
Attorney General of California
Xavier Becerra

Phillip J. Lindsay
Senior Assistant Attorney General

Julie A. Malone
Supervising Deputy Attorney General

Kathleen R. Walton
Deputy Attorney General